**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AFFORDABLE RECOVERY HOUSING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12-cv-4241 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| THE CITY OF BLUE ISLAND, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are motions for a preliminary injunction [18, 20] filed by Plaintiff Affordable Recovery Housing ("Plaintiff" or "ARH"), seeking relief against Defendants the City of Blue Island and its Fire Chief, Terry Vrshek, (collectively "Defendants," "the City," or "Blue Island"). For the reasons stated below, Plaintiff's motions [18, 20] are respectfully denied.

**I.    Background**

ARH is a non-profit, faith-based organization which provides recovery and housing services to adult men in Blue Island, Illinois.  According to ARH, its mission is to "help individuals reach their full potential by the power of Grace and God and their active role in recovery with guidance, discipline and direction."  In March 2011, ARH moved into a property at 13811 S. Western Avenue in Blue Island, Illinois, which it leases from the Mantellate Sisters of Mary.[1]  The property is presently zoned R-1, Single Family Residential.  The site has five buildings, several of which are connected.

---

[1] The property was the site of Mother of Sorrows High School until 1983.  In 1989, the Mantellate Sisters leased some of the buildings to a local high school district for an alternative school.  The school vacated the property on January 2, 2009.

In March 2011, when ARH opened its facility, the City allowed ARH to move fourteen people—ARH staff and their families—into the facility, at least in part to provide security for the Sisters. On March 20, 2011, John Dunleavy, President and CEO of ARH, submitted an "Original Phase Plan" to Dave Minderman, the Building Commissioner for Blue Island at the time. Minderman told Dunleavy to install a fire alarm/smoke detector system through Buildings B, C, D, and E. The Plan also called for ARH to install a sprinkler system at a future date. According to Dunleavy, after ARH installed the fire alarm system, Minderman gave Dunleavy oral permission to move an additional forty men into the facility. The parties dispute whether Dunleavy actually received permission from Minderman or anyone from the City, and Dunleavy acknowledges that he did not received anything in writing in regard to housing any additional people at the facility (beyond the fourteen who it is undisputed have permission to reside there). Plaintiff then moved additional men into the facility, reaching a peak of seventy-two at the time that this controversy erupted. According to Plaintiff, the City has conducted five or six fire inspections of the ARH property over the last year.

On February 28, 2012,[2] Blue Island Mayor Donald Peloquin sent Plaintiff a letter advising that the City's building department would not issue additional permits for the property at that time and instructing ARH to submit an application to the Blue Island Zoning Board for a hearing regarding ARH's goals and parameters. On May 9, 2012, representatives from the Mantellate Sisters and ARH appeared before the City Planning Commission. Plaintiff was requesting the Commission to recommend that the Zoning Board of Appeals as well as the City Council grant ARH a special use permit. The Plan Commission asked Plaintiff to continue to improve the proposal and come back to the Commission in June. On May 29, 2012, Plaintiff

---

[2] The letter is dated February 28, 2011, but the parties agree that it was actually sent on February, 28, 2012, and that the date was a typographical error. See [34].

received a report from its architectural consultant at Yung Architects LLC. Of particular interest to the instant dispute, the architect opined that while the Code requires a sprinkler system, other steps such as hiring a night watchman, installing hard-wired smoke detectors, and emergency escape ladders should be prioritized. As of July 3, 2012, Plaintiff had not returned to the Plan Commission to advance its request for a special use permit.

On May 22, 2012, the Blue Island Fire Chief, Terry Vrshek, received information that Plaintiff chained its doors shut at night. According to Vrshek, he went to the facility that same night and observed that all exit doors—except for the front door—were chained with locks on them. The locks were not in the locked position, but the doors could not be opened without removing the locks and chains. Vrshek informed Plaintiff that he had to remove the chains and locks for safety reasons.

On May 23, Vrshek, as well as Retired Fire Chief and Acting Fire Prevention Officer Copp, Deputy Police Chief Cornell, and Health Inspector Mailhoit, performed a scheduled inspection of ARH's facility. The inspection revealed that the buildings had been converted into sleeping quarters and ARH was now housing more than seventy residents.[3] It also revealed that no sprinklers had been installed.

On May 24, 2012, the City served ARH with a letter ordering Plaintiff to cease operations and vacate the premises by June 1, 2012. That letter stated that the City's "primary concern is the sprinkler system" and advised that "the sprinklers should have been installed prior to the residential quarters conversion." The letter also informed Plaintiff that it could appeal the decision to the Mayor or City Council. Plaintiff appealed to the City Council on May 28, 2012

---

[3] As discussed in more detail below, Plaintiff maintains that during various inspections of the premises City officials would have learned at an earlier date that more than fourteen individuals had moved into the facility – although there is no evidence that anyone at the City would have known or suspected that the number was more than seventy.

The City Council heard Plaintiff's appeal on June 12, 2012, and affirmed the May 24 Order by a 14-2 vote.

On May 31, 2012, ARH filed its original complaint along with a motion for a temporary restraining order [4]. In the original complaint, ARH alleged that Defendants' attempt to remove Plaintiff's clients and shutdown the ARH facility for failure to adhere to the City's Fire Code and Life Safety Code violates Plaintiffs First Amendment rights of free exercise of religion and freedom of association, Plaintiff's Fifth Amendment due process rights, and the Illinois Religious Freedom Restoration Act ("IRFRA").

On June 1, the Court held a hearing after which Plaintiff's withdrew the TRO motion without prejudice and the parties agreed as an interim measure that: (1) Plaintiff would find alternative housing arrangements for no fewer than 18 residents within 14 days; (2) Defendants would send Plaintiff a letter explaining the basis for the asserted city code violations by 6/6/2012; (3) Defendants would place Plaintiff's administrative appeal on the agenda for the 6/12/2012 city council meeting; (4) Plaintiff would continue to take steps toward obtaining pertinent license(s) and permit(s) to operate in compliance with state and local rules and regulations; (5) if Plaintiff had not demonstrated a right to lawfully operate, Plaintiff would make alternative housing arrangements for all remaining residents–with the exception of the 14 people allowed to remain on the premises by the City of Blue Island–within 30 days; (6) Plaintiff and Defendants would work together cooperatively to resolve legal and administrative issues during the pendency of this case. The parties' agreement was embodied in a minute order [6], and the deadline for Plaintiff to demonstrate its right to lawfully operate or make alternative housing arrangements for its clients subsequently was extended to July 14, 2012 by agreement of the parties [see 25]. At the initial hearing, the Court focused the parties' attention on Plaintiff's

due process claim, and especially on the City's obligation to provide Plaintiff with clear notice of the asserted Code violations and how to exercise its appeal rights. Defendants sent correspondence to Plaintiff addressing those points and the appeal proceeded.

After the City Council rejected Plaintiff's appeal, on June 19, 2012, Plaintiff filed two motions for preliminary injunction [18, 20] as well as a motion to file an amended complaint [22]. On July 3, the Court granted Plaintiff's motion to file an amended complaint, which contains six counts, alleging that Defendants infringed on ARH's First Amendment rights of free exercise of religion and association, Fifth Amendment Due Process Rights, Plaintiff's rights under the Illinois Religious Freed Restoration Act ("IRFRA"), and its rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). In the two preliminary injunction motions, Plaintiff argues that (1) the ARH facility at 13811 S. Western Avenue is an existing use property, (2) the ARH is not obligated to install a sprinkler system, and (3) the City cannot evict Plaintiff's clients who reside at the facility and shut down its operations. Defendants' filed response briefs [27, 28] and the Court held a preliminary injunction hearing on July 3, 2012 [31], at which it took testimony and heard extensive argument from counsel for both sides.

## II.    Analysis

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); see also *Goodman v. Ill. Dep't of Financial & Professional Reg.*, 430 F.3d 432, 437 (7th Cir. 2005) (same). A party seeking a preliminary injunction must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead*

*Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets its initial burden, then the court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). The court also considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.*

### A.      Likelihood of Success on the Merits

A party seeking a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008). This is an "admittedly low requirement." *Id.* However, if a plaintiff fails to demonstrate any likelihood of success on the merits, the motion for preliminary injunction must be denied. See, *e.g., Cox v. City of Chicago,* 868 F.2d 217, 223 (7th Cir. 1989).

### 1.      Permitted Use in the R-1 Residential District

Plaintiff first seeks a declaration that its current use is permissible as a matter of existing zoning law. The parties agree that the ARH property is located within an R-1 Residential district and that permitted uses in an R-1 zone include: one family detached dwellings; churches, rectories, parish houses and convents; libraries, parks and playgrounds; and elementary schools. Plaintiff argues that the ARH facility is a permitted use in the R-1 Residential district in which it is located and therefore Plaintiff does not need to obtain a special use permit from the City. More specifically, Plaintiff argues that under *Hazel Wilson Hotel Corp. v. Chicago,* 17 Ill. App. 3d 415 (1st Dist. 1974), ARH's current use as a transitional housing facility and future use as a recovery housing facility are substantially similar and compatible uses to those listed as R-1

Residential uses.  Plaintiff also contends that the City's deprivation of Plaintiff's right to operate for a zoning violation is unconstitutional.

Plaintiff's reliance on *Hazel Wilson* is misplaced.  In *Hazel Wilson*, the plaintiff operated a shelter care home in a business district for three years and obtained various licenses and permits as required by the city at a time when there were no zoning regulations for such facilities.  The city then passed a non-cumulative ordinance that allowed shelter care homes in certain residential districts, but not the district in which the plaintiff's home was located.  The court held that because the original ordinance made no provision for shelter care homes, plaintiff was permitted to operate in any zone that was not incompatible with the plaintiff's current use. The court also held that because the plaintiff was operating the shelter in the district and in a manner not inimical to the public health, safety, or welfare prior to the amended ordinance, it was unconstitutional to retroactively deprive plaintiff of that that use.  *Id*. at 419-20.   Here, by contrast, the Blue Island Zoning Code is not non-cumulative—where a use is permitted by right or special use in a lower district, it may be considered a permitted or special use in a higher district.  The property in question is an R-1 Residential district.  While it is undisputed that Plaintiff was given permission to have fourteen staff members in residence at the facility, Plaintiff has not made a clear showing of any right to legally operate a transitional housing facility or recovery housing facility with seventy-two residents in the R-1 zone.

Even more significantly, however, Plaintiff also cannot show a likelihood of success on the argument that its use is "not incompatible with or significantly different from the uses" (*Hazel Wilson*, 17 Ill. App. 3d at 419) in an R-1 Residential District.  Not only does Plaintiff admit that it has had up to seventy two residents living in the facility, but it also admits that it has job training programs, an auto shop, a wood shop, classrooms, substance abuse programs, a

commercial kitchen, and a banquet facility on site. The nature and scale of these uses goes far beyond and thus is not compatible with or similar to the approved R-1 uses of one family detached dwellings — churches, rectories, parish houses and convents; libraries, parks and playgrounds; and elementary schools. And because it is not compatible or similar to the approved R-1 uses, Plaintiff must obtain a special use permit from the City in order to operate in that zone.

Plaintiff admits that it has not obtained such a permit. Nevertheless, it argues that requiring ARH to find alternative housing for its clients until a sprinkler is installed violates the First Amendment, RLUIPA, and IRFRA because it substantially burdens Plaintiff, and the City has no compelling interest in enforcing this requirement. Plaintiff specifically focuses its argument on Section 2000cc(a)(1) of RLUIPA, which provides that "[n]o government shall impose or implement a land use regulation that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest."

But RLUIPA does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variations, special permits, or exceptions to land use regulations. See *Civil Liberties for Urban Believers v. City of Chicago*, 342 F. 3d 752, 762 (7th Cir. 2003) (denying claim that zoning regulation prohibiting churches in certain areas violated RLUPIA and noting that "[o]therwise, the compliance with RLUPIA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from

8

land-use regulations. Unfortunately for [the churches], no such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise.")

According to Plaintiff, the question is whether the regulation imposes a substantial burden that is not in furtherance of a compelling governmental interest and is not the least restrictive means of advancing that purpose. In this case, Plaintiff's attempt to deal with the elements of that standard fails at every turn. To begin with, the zoning ordinance does not place a substantial burden on Plaintiff. The City has a process by which Plaintiff can apply for and obtain the special use permit that is required to operate a facility that does not conform to the pre-approved R-1 uses. The Mayor referenced that process in his February 2012 letter, but Plaintiff's efforts in that direction appear to have been sporadic and thus, not surprisingly, the process has not yet run its course. But Plaintiff cannot sidestep the process and rules and then come to this Court demanding an order that the rules do not apply to it as they do to everyone else. As the cases cited above hold, RLUIPA does not mean that religious organizations receive special treatment. Plaintiff, therefore, has failed to prove how getting a special use permit—as required in the City's zoning ordinance—is a substantial burden. Nor, for that matter, is obtaining the sprinkler itself a substantial burden. While it is a significant expense, it is one that under the applicable code is standard for the kind of facility that Plaintiff seeks to operate—and with good reason, for "[a]s the number of residents put at risk by fire increases, the requirements naturally become more strict." 2012 LSC Chapters 32/33, page 1037. In short, the ordinances, which are neutral on their face and require only that Plaintiff obtain a special use permit and install a sprinkler, imposes modest burdens that likely could have been satisfied by now had Plaintiff focused on them at the outset of its venture. See *World Outreach Conference Center v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) (finding that the City's designation of a

church as a landmark, thereby preventing the plaintiff from demolishing it, was a modest burden because the building could still be sold or rented).

Similarly, the First Amendment rights of freedom of religion and assembly do not give religious organizations a pass on zoning regulations. In one of the cases on which Plaintiff relies, the Supreme Court stated that in "addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that the law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 530, 531 (1993). The requirement that Plaintiff apply for a special use permit to operate in an R-1 Residential zone is neutral and of general applicability. Furthermore, making sure that large recovery facilities with work shops and banquet halls obtain permits and licenses and comply with applicable codes *before* operating in R-1 residential zones is a narrowly tailored means of advancing a compelling state interest. See *Civil Liberties for Urban Believers*, 342 F. 3d at 765 (finding that zoning regulation affecting churches is neutral and generally applicable and in any event "to the extent that the [zoning ordinance] incidentally regulates speech or assembly within churches, such regulation is motivated not by any disagreement that [the city] may have with the message conveyed by the church speech or assembly, but rather by such legitimate, practical considerations as the promotion of harmonious and efficient land use.") There is nothing about enforcing zoning or fire safety codes that smacks of religious intolerance, nor is there any suggestion in this record that the City has come down hard on Plaintiff while looking the other way as other non-religious entities skirt the zoning and fire safety rules. For all of these reasons, the Court respectfully concludes that Plaintiff is not likely to succeed on the merits of its request for a declaration that its current use

of its facility is a permitted use in an R-1 residential district or its argument that requiring a special use permit interferes with Plaintiff's First Amendment rights.

### 2.    Existing Use and Sprinklers

Plaintiff also seeks a declaration that under the 2012 NFPA Life Safety Code ("LSC"), the facility at 13811 S. Western Avenue in Blue Island is an "existing building" and, therefore, sprinklers are not required.  SC §§ 33.1.1.1, 33.2.3.5.1.  But looking at the language of the LSC, the Court respectfully disagrees.

Under the LSC, a residential board and care occupancy ("RBCO") is either "small" or "large" depending on the number of clients in the facility.[4]  Facilities that serve sixteen or fewer clients are "small" facilities, whereas facilities that have more than sixteen clients are "large" facilities.  LSC § 32.2-3.  In March 2011, when the City gave Plaintiff permission to move fourteen people in, Plaintiff was a "small" facility as defined by the Code.  But when Plaintiff increased the number of residents beyond sixteen, the facility changed from a "small" facility to a "large" facility.  And according to LSC § 33.1.7, "[a] change in facility size from small to large shall be considered a change in occupancy subclassification and shall require compliance with the provisions applicable to new construction."  Thus, when Plaintiff increased the occupancy from fourteen to seventy-two, the occupancy subclassification changed from an *existing small* facility to a *new large* facility and, consequently, Plaintiff must comply with the requirements for new large RBCO in Chapter 32 of the 2012 LSC.  Chapter 32.2.2.5 expressly states that "All buildings shall be protected throughout by an approved automatic sprinkler system installed in accordance with 9.7.1.1(1) and provided with quick response or residential sprinklers throughout."  Therefore, under the language of the code, once Plaintiff converted 13811 S.

---

[4] The Parties agree that ARH is a residential board and care occupancy. The definition of a RBCO is "An occupancy used for lodging and boarding of four or more residents, not related by blood or marriage to the owners or operators, for the purpose of providing personal care services." 2012 LCS § 6.1.9.

Western from a small facility to a large facility—which it did when it increased the occupancy beyond sixteen—it became a *new* facility under the code, and Plaintiff was required to install an automatic sprinkler system.

At the preliminary injunction hearing, Plaintiff attempted to argue that there was no change from small to large because: (1) the facility was always capable of housing more than sixteen residents; and (2) the city gave Plaintiff oral permission to move in forty residents. Neither argument is persuasive.  First, the fact that the facility was capable of housing more than sixteen residents in March, 2011, when the City approved ARH to move in fourteen residents, does not make it a large facility.  By Plaintiff's logic, if the facility was an empty warehouse with the capacity for 100 residents, there would be no change in status when an occupant converted it from an empty warehouse to a RBCO.  Indeed, almost any large building has the capacity to house more than sixteen people and thus, by definition, would be a large facility under Plaintiff's lights regardless of its prior use.  The trigger for the application of Section 33.3 is not occupancy alone; rather, that section applies "to residential board and care occupancies *providing* sleeping accommodations to more than 16 residents."  LSC § 33.3.1.1.1.  Prior to Plaintiff's taking over the buildings, it was not providing "residential board and care" at all at the Blue Island location. And although Plaintiff soon obtained permission to operate as a small facility with fewer than sixteen (staff) people in residence, its decision to increase the number of individuals served to seventy-two (mostly non-staff) people is exactly the kind of change in facility size that the LSC Code accounts for in § 33.1.7.

Plaintiff's second argument—that the City knew that Plaintiff had as many as forty residents living in ARH as late as September 2011 and in fact approved of that increase—also fails.  Plaintiff offers as proof the testimony of its President and CEO, John Dunleavy, who

testified that then-Building Commissioner Minderman orally agreed in September 2011 that Dunleavy could move up to forty residents into the facility. Defendants, on the other hand, deny that Minderman or anyone else from the City ever gave permission to increase the number of occupants over fourteen and have submitted an affidavit from Minderman so attesting. The record is devoid of any corroboration or contemporaneous written evidence of either side of the story or of any details concerning this alleged agreement. With the evidence of the very existence of the agreement in equipoise and the details of the agreement sketchy at best, the Court concludes that Plaintiff has fallen short of making a "clear showing" sufficient to persuade the Court that it has (or ever had) a lawful right to operate a large residential board and care facility at its Blue Island location and thus should be classified as an existing large facility, instead of a new one. See *Mazurek*, 520 U.S. at 972. Again, the Court notes that had Plaintiff applied for permits and received official written permission from the City to move in more people *before* physically moving them into the facility, it would not be in the current predicament.

Plaintiff also notes that in some circumstances the LSC authorizes an entity to avoid the sprinkler requirement based on its evacuation capability and that the City has not yet made the relevant determination in regard to Plaintiff's facility. See LSC §§ 3.3.76.-13, 33.3.1.2. This argument also misses the mark. First, the section to which Plaintiff cites deals exclusively with existing facilities. As discussed in detail above, when Plaintiff moved more than sixteen people into its facility it became a *new* facility under the LSC. Thus, the exemption does not apply. Furthermore, even if this section did apply, Plaintiff could not invoke it in support of a motion for preliminary injunctive relief barring the enforcement of the Code's default rule where the record is devoid of any efforts by Plaintiff to present its case in support of the exemption. For

example, Plaintiff does not contend that it submitted an evacuation plan to the City or requested from the City the determination required under LSC § 3.3.1.2.1.1.

Finally, Plaintiff again argues that enforcing the LSC and requiring Plaintiff to install sprinklers is a violation of its First Amendment right to free exercise of religion and association, RLUIPA, and IRFRA. Plaintiff argues that while the LSC may appear neutral and generally applicable on its face, the City's misguided application requiring ARH to have sprinklers is not neutral and generally applicable. But the 2012 LSC, which is a nationally adopted code that applies equally to all in Blue Island, is neutral and generally applicable. In any event, enforcing the LSC is the least restrictive means to further the compelling state interest of reducing fires and protecting life and property in the City, including the lives and property of Plaintiff and its clients. See LSC 32/33. (justifying the increase in regulation for small and large facilities—"As the number of residents put at risk by fire increases, the requirements naturally become more strict.") Accordingly, the Court concludes that Plaintiff is not likely to succeed in its challenge to the City's classification of Plaintiff as a large new facility that requires sprinklers under the 2012 LSC. See also *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.

### 3. Authority to Evict

Plaintiff's final argument is that even if it is in violation of the Code, Defendants do not have the legal authority to evict ARH's clients from the premises and shut down its business. The Court respectfully disagrees.

Plaintiff acknowledges that the City has myriad ways to enforce the LSC (and presumably the Fire Code as well). Among those referenced by Plaintiff include fines, penalties, and even imprisonment. Plaintiff also recognizes that the City may issue "stop work" orders. But Plaintiff contends that the Fire Chief lacks authority to order an eviction of Plaintiff's

premises absent an "imminent danger," which according to Plaintiff requires a "confident belief" that the absence of sprinklers is "reasonably expected to cause" death, serious physical harm, or serious property loss. Absent those circumstances, Plaintiff contends, the City cannot issue an eviction order, but instead must impose some lesser penalty and seek any eviction order in a court of competent jurisdiction.

The Court does not read the City's authority so narrowly. To begin with, the Court notes that a key term under both the Fire Code and the LSC is "AHJ" or "authority having jurisdiction." Blue Island has adopted an ordinance specifying that its AHJ is the Fire Chief. Plaintiff correctly notes that under both the Codes and the City's ordinances, remedies short of eviction are available. But "[w]here a violation creates an imminent danger, the AHJ is authorized to abate such hazard in accordance with [Section] 1.7.15 [of the Fire Code]." Section 1.7.15, in turn, provides that "[w]hen, *in the opinion of the AHJ*, an imminent danger exists, the AHJ shall be authorized to order the occupants to vacate, or temporarily close for use or occupancy, a building, the right-of-way, sidewalks, streets, or adjacent buildings or nearby areas." Fire Code § 1.7.15 (emphasis added).

The Court cannot accept Plaintiff's reading of the interplay between Fire Code §§ 1.7.15 and 3.3.156, the latter of which defines "imminent danger." Plaintiff would have the Court determine judicially whether the current conditions on Plaintiff's premises create "a condition or practice in an occupancy or structure that poses a danger that could reasonably be expected to cause death, serious physical harm, or serious property loss." But the Code itself confers the right to make that determination on the AHJ; under the Code, it is "the opinion of the AHJ" that matters in assessing imminent danger.[5]

---

[5] If there were no basis whatsoever for the Fire Chief's assessment—in other words, that the notion of an imminent danger were fanciful—the Court might be persuaded to discount the discretion afforded to the

In any event, if the Court were to independently assess whether an "imminent danger" exists within the meaning of the Code, it would agree with the Fire Chief. Plaintiff contends that there can be no imminent danger unless the record shows a "confident belief" that serious harm "will take place." If that standard were literally applied, virtually no prophylactic fire safety measures could be required. Apart from circumstances like those present in the Colorado Springs area a few weeks ago—where a blazing fire covering thousands of acres was bearing down on the outskirts of a heavily populated area—one can never have a "confident belief" that a fire will cause death, serious physical harm, or serious property loss in any given location. But the whole point of all fire safety measures, including fire extinguishers, fire alarms, and sprinkler systems, is to prevent serious harm when the unexpected happens—namely, a fire starts. And Section 3.3.156 recognizes just that: the condition or practice on the premises (here, the absence of a sprinkler) need only "pose[] a danger" that could be reasonably expected to cause death, serious physical harm, or serious property loss. The danger posed by the absence of a sprinkler on Plaintiff's leased premises is a fire from which some of the dozens of residents cannot escape and/or the damage to property cannot be controlled until its spreads throughout the immediate premises and perhaps to neighboring buildings as well. The Fire Chief determined that danger to be present on the premises leased by Plaintiff, and neither the Code nor common sense compels

---

Chief under the Code and proceed directly to the kind of independent analysis of fire safety that Plaintiff posits. But in this instance, even Plaintiff's own architect agrees with the Fire Chief's assessment that the Code requires sprinklers. It also is undisputed that on the date that this lawsuit was filed, Plaintiff had in residence more than seventy unrelated men in various states of recovery from prior addictions. This is not a situation where no reasonable person could agree with the Fire Chief's assessment, both as to what the Code requires and the imminence of the danger associated with non-compliance. Because the proposition that an imminent danger exists is at least arguable and the Code authorizes the AHJ to make the call, the Court is not inclined to substitute its judgment for the Chief's. And the Chief's call likewise is not subject to judicial intervention simply because other city officials, including the Chief's predecessor, may have made a different judgment, or because Plaintiff's architect believes that the danger caused by the absence of a sprinkler is not imminent.

the Court to second guess that determination on the basis that no one can confidently say that the danger actually will come to pass. We all certainly hope that it never does.

Plaintiff's other arguments with regard to the Fire Chief's authority also fail. Plaintiff first references Section Fifteen of the City's March 2012 ordinance, which is entitled "Fines-Penalties-Costs." That section discusses fines that may be levied for ordinance violations and also states that "[n]othing herein contained shall prevent the City from pursuing such other lawful action as is necessary for the restraint, correction, and abatement of any violations." According to Plaintiff, that section allows the City to "seek restraining and mandatory injunction orders from a Court." The Court agrees that the language of Section Fifteen encompasses court action, but disagrees with Plaintiff's suggestion that the City is powerless to impose eviction orders on the authority of the Fire Chief without prior judicial approval.

Plaintiff next argues that the number of persons living at the facility does not bear on the "imminent danger" analysis. The Court disagrees. A central premise of the distinction between "small" and "large" facilities is that "[a]s the number of residents put at risk by fire increase, the requirements naturally become more strict." 2012 LSC Chapter 32/33, page 1037. Plainly, the risk associated with seventy-two people, many of whom are temporarily on the premises and in various stages of recovery, is greater than those associated with fourteen staff members who are presumably very familiar with the premises.

Plaintiff's focus on the lack of guidance from the City in regard to implementing the so-called "five-year phased plan" and the absence of responses from the City to Plaintiff's requests for movement on permits remain also is unpersuasive. First, the plan is not a contract that creates formal, binding obligations on either side. Thus, even if "[t]he question of sprinklers under the plan is premature," as Plaintiff contends, the question of sprinklers under the City

17

ordinance is not. Second, to the extent that Plaintiff claims obstruction on the part of the City, the absence of any documentary evidence of Plaintiff's requests and the City's responses (or lack thereof) in the record seriously undermines Plaintiff's contentions.

Finally, because the Court concludes that Plaintiff is unlikely to succeed on its challenge to the Fire Chief's asserted authority to evict Plaintiff under Section 1.7.15 the Code, it need not address in detail whether the Fire Chief also has the authority under Section 1.7.14—the work stop order provision. Briefly, however, it does appear that the Fire Chief may also have authority under this section as well. Section 1.7.14 grants the Fire Chief the authority to "order an operation, construction, or use stopped when any of the following conditions exists: (1) Work is being done contrary to provision of this Code; (2) Work is occurring without a permit required by Section 1.12; (3) An imminent danger has been created." Fire Code § 1.7.14. Plaintiff's action of operating a facility housing more than seventy men without a sprinkler could be considered work "contrary to the provision" of the Code, allowing the Fire Chief to stop Plaintiff's operation and use of the facility in that manner.

In sum, Plaintiff has also failed to show a likelihood of success on its claim that Defendant does not have a right to evict Plaintiff's clients from the facility at 13811 S. Western Avenue as long as Plaintiff operates the facility without a sprinkler.

## B. Adequate Remedy at Law and Irreparable Harm

Because the Court concludes that Plaintiff failed to demonstrate any likelihood of success on the merits of any of its claims, the motion for preliminary injunction must be denied. See, *e.g., Cox v. City of Chicago,* 868 F.2d 217, 223 (7th Cir. 1989). But in the interest of completeness, the Court will briefly address the other elements of a preliminary injunction.

The other two threshold elements that ARH must prove to support the issuance of a preliminary injunction are that it (1) has no adequate remedy at law and (2) will suffer irreparable harm if the injunction is not issued. These two requirements—irreparable harm and no adequate remedy at law—tend to merge. See *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id.* An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); see also *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages").

In *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir 2004) the Seventh Circuit also noted that:

> When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor. *Connection Distrib. Co.*, 154 F.3d at 288, *cited in ACLU of Ken. v. McCreary*, 354 F.3d 438, 445 (6th Cir.2003); *see, e.g., Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 507 (7th Cir.1998). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and money damages are therefore inadequate, *Nat'l People's Action,* 914 F.2d at 1013.

Because Plaintiff asserts primarily First Amendment claims, the determinative factor at least as to those claims is the success on the merits. As discussed above, Plaintiff has failed to carry its burden of proving it has even a negligible likelihood of success on the merits of any of the claims

19

advanced in its motion. But because not all of Plaintiff's claims are First Amendment claims, the Court will address whether Plaintiff has established the inadequacy of its available remedies at law. Plaintiff has not. In fact, Plaintiff had, and continues to have, an opportunity to appear before the Zoning Board in pursuit of the required licenses to operate. Having declined to fully avail itself of that available process, Plaintiff cannot persuasively argue that it lacks a remedy at law.

Finally, Plaintiff also has failed to meet its burden as to irreparable injury. Plaintiff's claim is that City's order to vacate will result in seventy-two men being thrown to the streets and will prevent them from exercising their First Amendment rights. But Plaintiff chose to put the proverbial cart before the horse when it moved those men into the building without ensuring that it had complied with the applicable City codes and permit schemes. Plaintiff cannot now claim it is being harmed by the City's actions to reduce the occupancy of the facility, at least temporarily in the interest of public safety, until the sprinkler is in place and the permit has been issued. In the meantime, nothing prevents Plaintiff from advancing its religious mission and other salutary purposes in any fashion that it can do so consistent with the applicable laws.

### C.     Balancing the Harms and Public Interest

Finally, balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the court to use a "sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 648 (N.D. Ill. 2002). Here, ARH has failed to show that it is likely to succeed on the merits and thus the balance of harms must tilt heavily in favor of Plaintiff in order to justify relief. It does not. In fact, the public interest in enforcing the LSC is

great. The City must be able to enforce facially neutral codes that are aimed to protect the lives of its citizens, including Plaintiff's clients. Granting the requested injunction would prevent the City from enforcing the LSC and protecting people and property from danger. It also could expose the City to liability for failing to enforce its own Code in the event that a fire did break out at Plaintiff's facility.

The Court of course is cognizant that moving Plaintiff's clients to other locations for their overnight housing is a hardship and the Court is not unsympathetic to Plaintiff's predicament. This is why the Court has endeavored from day one of this litigation to work with the parties on a transitional scheme and has set deadlines that allowed time not only for the parties and the Court to work through the legal issues raised in the pleadings, but also for Plaintiff to help its clients make alternative arrangements if that became necessary. It has now been six weeks since the original date on which the City first ordered Plaintiff's clients to leave the premises; the Court appreciates the parties' cooperation in setting and extending the dates reflected in the prior orders and hopes that Plaintiff, its clients, and indeed the City as well have been successful in locating safe, alternative temporary sleeping accommodations for the men who will be affected. But at the end of the day, the Court concludes that the harm to Plaintiff and its clients associated with moving out of the premises at least until the sprinklers are installed is not nearly enough to overcome the harm to the City of not being able to enforce its safety codes.

Ultimately, the Court cannot help but echo the comments that it made at the end of the hearing suggesting that this situation was likely avoidable. Had Plaintiff focused more on securing, preferably in writing, the City's views on the requirements for Plaintiff's planned uses and applied for and received all of the appropriate permits and licenses from the city and state *before* it started moving in clients, its operations would have moved along more slowly, but

ultimately more smoothly and successfully. This is not to say that the City has been without fault in this process. For example, Defendant Vrshek admitted to the City Council that he may have acted too hastily in proposing to evict Plaintiffs with one week notice and the City might have reduced its litigation costs by being clearer with Plaintiff—again, preferably in writing—at various stages of the parties' relationship over the past two years. While the result of this order is no doubt a setback for Plaintiff, it has plans to install a sprinkler (which it may wish to expedite) and now has legal counsel as well who may be in position to assist in moving the permit process forward. At this time, however, the Court can see no basis for judicial intervention in the form of the entry of preliminary injunctive relief as Plaintiff has requested.

## III. Conclusion

For the foregoing reasons, Plaintiff's motions for preliminary injunction [18, 20] are respectfully denied.

Dated: July 13, 2012

_____
Robert M. Dow, Jr.
United States District Judge