IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AFFORDABLE RECOVERY HOUSING, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE CITY OF BLUE ISLAND, et al., ) <br> ) <br> Defendants. ) | Case No. 12-cv-4241 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's motion to reconsider [38] the Court's denial of Plaintiff's preliminary injunction motions [37]. For the reasons stated below, the motion [38] is respectfully denied.

**I.     Background[1]**

After a May 23, 2012 inspection of Plaintiff Affordable Recovery Housing's ("ARH") faith-based recovery facility revealed that ARH was housing upwards of 70 adult male clients in buildings that lacked a sprinkler system, the fire chief of the City of Blue Island, Illinois served ARH with a letter ordering it to cease its operations and vacate the property by June 1, 2012. ARH appealed to the city council on May 28. While the city council's decision was pending, ARH filed a complaint and motion for a temporary restraining order in this Court. ARH alleged that the City's attempt to remove its clients and shut down its facility for failure to adhere to City's Fire and Life Safety Codes violated its First Amendment rights of free exercise of religion and freedom of association, its Fifth Amendment due process rights, and the Illinois Religious Freedom Restoration Act.

---

[1] The Court assumes general familiarity with the facts of this case, which are discussed in greater detail in its previous opinion [37].

The city council rejected ARH's appeal on June 12. The City had also previously rejected ARH's attempt to obtain a special use zoning permit for its facility. In light of these rejections, ARH filed two motions for preliminary injunction, one pertaining to sprinklers [18], and one pertaining to its zoning status [20], as well as a motion to file an amended complaint [22]. The Court allowed ARH to file an amended complaint, which added allegations about ARH's attempts to obtain a special use permit and a claim that Defendants violated its rights under the Religious Land Use and Institutionalized Persons Act. After taking evidence and holding a hearing on the preliminary injunction motions, the Court issued an order and opinion denying both of ARH's motions for preliminary injunction [37]. ARH filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) [38].

## II.  Legal Standard

Rule 59(e) is the proper procedural vehicle by which ARH may challenge the Court's previous order. See *Fin. Servs. Corp. of the Midwest v. Weindruch*, 764 F.2d 197, 198 (7th Cir. 1985); see also Fed. R. Civ. P. 54(a); 28 U.S.C. § 1292(a)(1); Charles Alan Wright et al., 11A FEDERAL PRACTICE & PROCEDURE § 2962 (2d ed. 2012) ("[I]njunctive orders are considered to be outside the scope of Rule 54(b)."). The Court may a grant Rule 59(e) motion "to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012) (quotation omitted). Rule 59(e) motions are "not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, or to present evidence that was available earlier." *Id.* (quotation omitted). Nor is a manifest error "demonstrated by the disappointment of the losing party. It is the 'wholesale disregard,

2

misapplication, or failure to recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997).

## III. Analysis

### A. Sprinklers

ARH first contends that the Court erred by failing to credit certain testimony that ARH presented at the preliminary injunction hearing. ARH first points to testimony from ARH CEO John Dunleavy that ARH relied on former City Building Commissioner David Mindeman's oral statements that ARH should first "focus on the fire alarm system" and take care of the sprinkler system at a later point in time. Defendants cross-examined Dunleavy but did not introduce any evidence directly refuting his testimony on this point. To begin with, in light of this absence of evidence, ARH submits that "the Court should have credited ARH's reliance on Mindeman's statement downplaying the importance of sprinklers" and "the Court erred in rejecting ARH's argument that a well-done fire alarm system in all the residential buildings was more important to the City than sprinklers in any of them." [38] at 3 (emphases omitted). ARH also asserts that "the Court should have credited that ARH relied on the City's multiple, indifferent communications regarding sprinklers over 16 months (January 2011 to May 24, 2012)." *Id.*

ARH has not provided the Court with any legal authority from which to conclude that it improperly weighed the evidence in this case. The Court is unpersuaded by ARH's bare suggestion that it should have automatically credited Dunleavy's testimony, which the Court deemed in some respects to be "sketchy at best," [37] at 13, simply because it was not directly refuted by evidence from Defendants. The Court is permitted to assess – and reject – the credibility of witness testimony presented at the preliminary injunction hearing. See *Russian*

*Media Group, LLC v. Cable Am., Inc.*, 598 F.3d 302, 305 (7th Cir. 2010); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1271 (7th Cir. 1995). The Court is not obligated to accept as true every word of testimony submitted merely because it was not specifically refuted, nor is it required to expressly "acknowledge" all testimony in its written opinion, particularly where that testimony was not pertinent to the arguments developed in ARH's briefing.

Nevertheless, to the extent that the Court was less than explicit in its previous opinion, the Court now elaborates on the reasons why it did not find Dunleavy's testimony concerning Mindeman's alleged assurances to be convincing. As the Court explained in its previous order, see [37] at 13, it is the movant's responsibility to make a "clear showing" of an entitlement to relief in light of all the evidence, and ARH failed to do so in this instance. Even if Mindeman did advise ARH to prioritize a fire alarm over a sprinkler system, that statement alone did not foreclose the City from requiring compliance (several months later) with the fire safety laws of general applicability concerning sprinklers after it learned that ARH had 70 (or more) clients residing at its facility. ARH acknowledges that at some point in early 2011, in the first meeting between the parties, the City told ARH that it should plan to install sprinklers, but only at some unspecified point in the future. ARH's arguments presume that it was entitled to an indefinite deferral of any obligation to come into compliance with the fire safety standards, but the record presents no basis for any such presumption. It was not unreasonable for the City to insist, nearly eighteen months after that first meeting, that ARH actually comply with the law requiring sprinklers, especially when it was housing on its premises 70 people in varying states of recovery.

ARH also submits that the Court should have credited Dunleavy's testimony concerning permission for up to 40 men to live on the premises that he allegedly received from Mindeman in September 2011. ARH acknowledges that Dunleavy's testimony in that regard was contradicted by Mindeman's affidavit. As to this argument, the Court originally concluded – and continues to believe – that the evidence stands in "equipoise" between Dunleavy's oral testimony, under oath, that Mindeman gave him permission to move in up to 40 men and Mindeman's written affidavit, also under oath, that he said no such thing. Had Dunleavy been able to support his contention with any corroboration or contemporaneous written evidence of the alleged agreement, the Court might have been inclined to credit his recollection over Mindeman's. But the absence of any such evidence is telling given the significance of the event in question. ARH asks the Court to conclude that the City, through its Building Commissioner, approved an approximately three-fold increase in the occupancy of the premises without even a trace of official confirmation concerning any details or conditions on its approval. The Court views that as an unlikely proposition, and thus resolves the factual dispute in favor of the non-moving party. ARH appears to suggest that the absence of an opportunity to cross-examine Mindeman is entirely the fault of the City. But the Court cannot see any reason why ARH – which bore the burden of demonstrating its right to relief – could not have subpoenaed Mindeman to testify if it felt his live testimony was critical. See, *e.g.*, *State Farm Fire & Cas. Ins. Co. v. Hood*, 2007 WL 4208283, at *1 (S.D. Miss. Nov. 6, 2007) (granting plaintiff's motion for order directing defendant to appear to provide testimony at preliminary injunction hearing where other witnesses determined to be unable to provide necessary testimony).[2] Thus, ARH's contentions that

---

[2] In a similar vein, ARH asserts on the basis of Dunleavy's testimony that "it was unmistakable to Mindeman that up to 54 people were residing" on the premises based on what Mindeman purportedly saw during his visits to the site. But the record as a whole does not support the inferences that ARH insists are "undisputed." There simply is nothing in the record establishing with any degree of precision what

5

"Mindeman's declaration should not have been equated with Dunleavy's oral testimony" miss the mark. The cases that ARH cites on this point are distinguishable in that the district courts in those cases failed to conduct evidentiary hearings altogether. Here, ARH had an opportunity to present its evidence in court – and on paper, see [38] at 12 – and merely disagrees with the Court's weighing of that evidence. ARH's disappointment does not a manifest error make. *Oto*, 224 F.3d at 606.

ARH's final contention pertaining to the sprinklers is that it was never required by the 2012 version of the National Fire Protection Association's Life Safety Code ("LSC") to install sprinklers because it at all times operated an "existing" "large" facility.[3] ARH asserts that when it received permission from the City to move 14 residents onto the property in March 2011 – an undisputed fact that the Court found in its prior opinion – those residents joined 9 to 11 members of the Mantellate Sisters of Mary who were already residing in one of property's five buildings. (ARH rents the property from the Mantellate Sisters of Mary.) ARH contends that it therefore had 23 to 25 "residents" from the get-go and was therefore always a "large" facility for purposes of the Life Safety Code. Thus, ARH continues, the Court's conclusion that ARH began as a

---

Mindeman or anyone else from the City saw during their visits to the ARH location. It seems unlikely that the residents would have been in their sleeping quarters if the visit took place during normal business hours, and it seems equally unlikely that City officials would have visited the facility at any time other than those hours. Again, perhaps Mindeman's testimony would have been helpful. But the evidence in the record provides no basis for inferring that Mindeman or anyone else likely would have known the number of men in residence from their observations. And, again, a contemporaneous record of ARH advising the City that it had 40 or 54 or any number of men residing on the premises would have helped create a reliable factual support for ARH's position on these matters, but there is no such record as far as the Court is aware.

[3] ARH "does not concede that the 2012 NFPA LSC is applicable to it," but nonetheless "contends that the 2012 NFPA LSC does not require it to install a sprinkler system as asserted by Chief Vrshek's June 4 letter." [22-1 ¶ 25]. ARH provided the Court only with portions of the 2012 LSC; no other possibly applicable versions of the LSC were submitted.

small facility and became a large facility subject to more stringent sprinkler requirements was in error.

The Court first notes that ARH neglected to raise this argument at the preliminary injunction stage. At that time, it contended only that its facilities were always physically capable of housing more than 16 people and that the City gave it oral permission to move 40 additional residents onto the property in September 2011. The Sisters were discussed at the hearing, but primarily in the context of establishing how many residents the property could physically accommodate and had accommodated at various points in the past. ARH's attempt to raise a theory that it easily could have easily raised before is alone reason enough to deny the motion for reconsideration. See *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012) (Rule 59(e) motions are "not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, or to present evidence that was available earlier").[4]

Even if the Court were to consider this argument, however, it would fail on substantive grounds. The parties agree that under the LSC, ARH operates a "residential board and care occupancy," defined by LSC § 6.1.9.1 as "an occupancy used for lodging and boarding of four or more residents, not related by blood or marriage to the owners or operators, for the purpose of providing personal care services." The LSC further classifies residential board and care occupancies as either "small," which provide sleeping accommodations for up to 16 residents, or

---

[4] ARH suggests that "time constraints" precluded it from filing a reply brief in support of its motion for preliminary injunction and that "the short time for closing argument" deprived the Court of any in-depth explanation of ARH's contentions. If ARH were concerned that it had not presented all of its arguments, notwithstanding that more than a month had elapsed between the filing of the motion and the hearing, it certainly could have requested leave to file a reply or a supplemental brief after the hearing. In fact, the Court worked cooperatively with the parties is setting all of the deadlines leading up to the hearing, allowed the parties to file supplemental briefs on various issues that arose at the hearing [see 32, 33, 34, 35], and considered all of those briefs in rendering its ruling.

"large," which provide sleeping accommodations for more than 16 residents. See LSC § 33.1.1.2. The LSC sets forth more stringent fire safety standards for large facilities than small facilities, in part because "[l]arger buildings are more difficult to evacuate than smaller buildings and require more built in fire protection." Similarly, new buildings are required to meet tougher standards than "existing" ones.

The buildings on the ARH property likely are "existing"; they were erected long before the current version of the LSC took effect. As a general matter, then, they are subject to the provisions governing "existing" buildings, those in Chapter 33 of the LSC. But LSC § 33.1.7 provides that "[a] change in facility size from small to large shall be considered a change in occupancy subclassification and shall require compliance with the provisions applicable to new construction." Thus, whether ARH's facility was "small" or "large" – and when the change, if any, was effected – is critical to determining what standards applied and whether ARH met them. ARH's (belated) contention that the Sisters "counted" for purposes of determining its facility size has little relevance to this determination, however. The LSC provided by ARH explains that "it is important that the occupancy classification for *each building or area* is properly identified and that proper separation between the occupancies is provided as necessary," and there is no dispute that the Sisters resided in a building that was entirely separated from ARH's residential care and board occupancy. Moreover, the Sisters likely were not countable "residents" in any event in that (1) they did not physically live in ARH's recovery facilities (which were in a separate building) and (2) they were not receiving any type of personal care services from ARH. See 2003 LSC § 3.3.182.[5]

---

[5]From what the Court can determine, the 2012 edition of the Life Safety Code is not available for viewing by the public. Because the parties provided the Court only with Chapters 32 & 33 of the 2012 Life Safety Code, and failed to provide the chapters providing definitions of certain terms, the Court by its own

8

Likewise, the 14 ARH staffers that moved onto the property probably were not "residents" for the purposes of the LSC – the Court says "probably" because, as noted above, the record provided to the Court by ARH did not include the section of the LSC containing definitions. The Court's previous opinion assumed, again, on the basis of the incomplete record, that the staffers were residents for the purposes of determining ARH's facility classification. Even if that assumption were incorrect, however, the fact remains that ARH began with zero residents and ended with approximately 70. At some point it necessarily crossed the threshold from "small" to "large" facility and at that time was required to comply "with the provisions applicable to new construction." "Automatic sprinklers are required in all new large residential board and care facilities." 2012 LSC at 1088. And even if the transition from small to large occurred, as ARH maintains, such that it was properly classified at all times as an "existing" "large" facility, ARH has not made the requisite "clear showing" that relief is warranted here. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The 2012 LSC requires "all existing large facilities with impractical evacuation capability" to have automatic sprinklers. See 2012 LSC at 1088. ARH asserts that the City failed to request an evacuation capability determination requirement from it, see LSC § 33.3.1.2.3.1, and suggests that it therefore should be absolved of any requirement to install sprinklers. But the LSC provides that "[w]here the documentation required by 33.3.1.2.3.1 is not furnished, the evacuation capability shall be classified as impractical." LSC § 33.3.1.2.3.2; see also LSC at 1037 ("Chapter 33 requires facility management to furnish the [fire chief] with an evacuation capability determination conducted using a procedure acceptable to the [fire chief]. *If documentation of such determination is not furnished, the evacuation capability is considered, by default, as impractical.*" (emphasis

---

efforts located the 2003 edition of the LSC, which was available for viewing and was in effect in Blue Island until March 2012.

added)). As the Court previously noted, "the record is devoid of any efforts by Plaintiff to present its case in support of the exemption." [37] at 13. That is, ARH has not provided the Court with any evidence from it can conclude at this time that ARH – if it was in fact always an "existing" "large" facility – ever conducted an evacuation capability determination or informed the City of the results. On the record before it, the Court again concludes, as it implicitly concluded before, that ARH falls within the default category and is required by the 2012 LSC to install sprinklers. The Court therefore declines to reconsider its holding that ARH has failed to demonstrate any likelihood of success on the merits of the sprinkler issue.

### B. Zoning

ARH also asks the Court to reconsider its denial of ARH's preliminary injunction motion pertaining to zoning issues [20]. ARH first contends that the City lacks the power or authority to issue a special use permit to ARH in any zone within the City. Like so many of the other arguments ARH currently asserts, this argument was not previously presented to the Court even though it "could and should have been made before the [Court] rendered [its] judgment." *Miller*, 683 F.3d at 813. ARH's belated attempt to raise a theory that it could have easily raised before is alone reason enough to deny its request for reconsideration.

This argument would also fail on the merits, however. ARH asserts that the City is precluded from issuing a special use permit to ARH by the bold and underlined portion of the following zoning code provision:

> USE, SPECIAL. A "special use" includes, *but is not limited to*, public and quasi-public uses affected with the public interest, and *may include* a private use, any one or more of which may have a unique, special or unusual impact upon the use or enjoyment of neighboring property, **which because of such characteristics could be properly classified as a permitted use in any particular district or districts.**

10

[38] at 14 (italics added by the Court; other emphases in original). This argument dovetails with ARH's other zoning-related contention that the Blue Island zoning code is "impermissibly exclusionary" because ARH's desired use is not permitted anywhere in the city. But in emphasizing the end of this zoning provision ARH overlooks the beginning, which clarifies that the definition of a "special use" is *non-exclusive*. The Court is thus unpersuaded that its earlier finding that ARH does not conform to the permitted uses for the R-1 zoning district in which it is located alone "precludes [ARH] from being a special use." [38].

ARH further contends that the City lacks the power to issue a special use permit because a second provision of the zoning code, § 8.10, "specifically limits the uses in each zone as to which the City may issue special use permit" to those "provided for in this Ordinance in the zoning district in which the land is located." ARH contends that its desired use "does not fit" into any of 19 special zoning uses for the R-1 district because "residential board and care occupancy," "recovery housing," and "transitional housing" are not listed in the code anywhere. As a result, ARH contends, Blue Island cannot possibly issue it a special use permit and, moreover, is impermissibly excluding it from all zones.

ARH is correct that these exact phrases are absent from the code, but its myopic view of the code overlooks the broad nature of many of the enumerated special uses and gives rise to untenable implications. ARH may wish to style itself as a provider of "transitional housing" or "recovery housing," but the absence of these exact terms from a zoning code of general applicability does not preclude it from locating in Blue Island any more than the code's provision allowing "hospitals" necessarily precludes from the City a medical facility that calls itself an "acute care center." Counsel for ARH informed the Court during the hearing that "we were told we need to be a planned unit development," [38-1] at 17:1-2, a recognized R-1 special use

defined by the zoning code as defined as a "group of two (2) or more principal buildings designed to be maintained and operated as a unit in single or multiple ownership or control and which has certain facilities in common, such as yards and open spaces, recreation areas, garages, and parking areas." Regardless of the terminology ARH uses to refer to itself or its mission, its property and desired use would seem to fall within the broadly defined special use category of "planned unit development," a use that the code does not exclude and that the City is authorized to permit. ARH's desired use may also conceivably fit within other special use categories, such as "Fraternal, Philantrhopic and Eleemosynary uses of Institutions" or "Public or private special education facilities for exceptional or handicapped persons." The Court declines to reconsider its earlier holding that ARH can – and must – obtain a special use permit to operate in the R-1 zone.

## III. Conclusion

ARH has asked the Court to reconsider only its determination that ARH had failed to demonstrate any likelihood of success on the merits. The Court declines to do so. The Court further reiterates that even if ARH were able to make this showing, the extraordinary relief of a preliminary injunction would not be appropriate at this time for the other reasons stated in the Court's previous opinion. See [37] at 18-22. In sum, Plaintiff's motion to reconsider [38] the Court's denial of Plaintiff's preliminary injunction motions [37] is respectfully denied.

Dated: January 25, 2013

_____
Robert M. Dow, Jr.
United States District Judge