# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AFFORDABLE RECOVERY HOUSING, an Illinois not-for-profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 12-cv-4241 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| THE CITY OF BLUE ISLAND, a municipal corporation, and TERRY VRSHEK in his official capacity as Blue Island Fire Chief, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER ON CONSIDERATION
## OF PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

Plaintiff Affordable Recovery Housing operates a recovery home in Blue Island, Illinois, using faith-based methods to assist those struggling with drug and alcohol abuse. In May of 2012, Blue Island Fire Chief Terry Vrshek issued Affordable Recovery Housing an eviction notice based on its failure to comply with the City's safety regulation requiring fire sprinklers in buildings that house overnight guests. Affordable Recovery Housing appealed (unsuccessfully), and then sued. On November 17, 2014, the Court effectively mooted the issue, concluding that because Affordable Recovery Housing is a state-licensed Recovery Home, it is governed by the Illinois DHS safety regulations (which preempt Blue Island's regulations), under which it is not required to install a sprinkler system. As a result of the Court's order, Affordable Recovery Housing has resumed operations. Nonetheless, it now seeks damages for Defendants' alleged discriminatory actions in enforcing Blue Island's safety and zoning regulations.

Before the Court are the parties' cross-motions for summary judgment [99, 100]. For the reasons stated below, Plaintiff's motion [99] is denied and Defendants' motion [100] is granted. As an administrative matter, Plaintiff's motion for leave to file a reply brief [111] is granted.

# I.     Background[1]

Since the mid-1950s, the Mantellate Sisters of Mary have owned a group of five buildings in the city of Blue Island, Illinois, located about 15 miles south of Chicago. One of the buildings on the property has continually functioned as a convent for the Mantellate Sisters. Until the mid-1980s, the remaining buildings served as the Mother of Sorrows High School (the property is still referred to as the "Mother of Sorrows" property), and a few years after the school closed, the Mantellate Sisters leased the property to a local school district where it again functioned as a high school for another 20 years or so, up until 2009.

In late 2010, John and Mary Jo Dunleavy began discussions with Blue Island Mayor Don Peloquin about converting the Mother of Sorrows property into a faith-based recovery home (called Affordable Recovery Housing) for adult men recovering from drug and/or alcohol addiction. The Dunleavys pitched Affordable Recovery Housing as a 24-hour, full-service rehabilitation program that would combine recovery support services, overnight lodging, meals and recreation, job training, medical and dental referrals, religious outreach, and myriad other services. The Mayor liked the idea, and things progressed rapidly. By early 2011, the Dunleavys had struck up deals with the Mantellate Sisters to rent the Mother of Sorrows property and with the Illinois Department of Human Services ("DHS") to obtain state funding [99-4, at 2–3], and in February 2011, with the Mayor's imprimatur, Plaintiff moved 14 staff members onto the property. However, the Mayor "told the Plaintiff to obtain the necessary state and city licenses and to come up with a plan for the development of the business and the building[s]" and "that it must install an automatic sprinkler system in the building before any additional residents could move in." [99-3, at 112.] On February 28, 2011, Mayor Peloquin wrote Affordable Recovery

---

[1] The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party.

2

Housing a letter, insisting that it "submit an application to the Blue Island Zoning Board for a hearing regarding [its] goals and the parameters by which [it] will accomplish them." [99-4, at 5.] At this time, Plaintiff had yet to file for or obtain any zoning permits for its intended use of the property.

Sometime in March 2011, Affordable Recovery Housing submitted to the City a five-year, four-phase plan for its development of the Mother of Sorrows property. Relevant here, Affordable Recovery Housing represented that in Phase A (which spanned the first 18 months of its plan), it would provide drawings, apply for all necessary permits and licenses, and install code upgrades (including sprinklers) in the school and banquet room. And in Phase B (which spanned the second 18 months of the plan) Affordable Recovery Housing would provide drawings, apply for all necessary permits and licenses, and installing all code upgrades (including sprinklers) for the old convent building. [99-4, at 9–17.]

Not long after Plaintiff submitted its five-year plan to Blue Island, John Dunleavy allegedly had a conversation with Blue Island Building Commissioner Dave Mindeman in which, according to Plaintiff, Mr. Mindeman "effectively changed" the five-year plan by instructing Plaintiff to prioritize the installation of a state-of-the-art fire alarm system, and to leave the installation of the fire sprinklers for another day. Plaintiff concedes that this "change" in its five-year plan was not documented or otherwise memorialized. Following this conversation, the Mantellate Sisters advanced Plaintiff $130,000 for the installation of the fire alarm system, which was completed sometime in June 2011. Plaintiff claims that shortly thereafter, Commissioner Mindeman gave Plaintiff permission to move 40 men into the recovery house, although there is no documented evidence of this approval, and Commissioner Mindeman avers that he did not give any such approval, written or verbal. [27, at 21.] Likewise, Mayor

Peloquin says that "Plaintiff never sought [his] approval to increase the number of people residing at Affordable [Recovery Housing] from fourteen (14) people." [99-3, at 111.]

The next major development occurred in early 2012, when, at the City's request, the Mantellate Sisters of Mary (on behalf of Affordable Recovery Housing) submitted a special use permit to the City of Blue Island, seeking permission to use the Mother of Sorrows site as a "planned use development." [99-5, at 17–33.] The Mother of Sorrows property is zoned R-1 (Single Family Residential), and according to Blue Island's zoning ordinance, R-1 properties can either be used for certain "permitted uses" or for certain "special uses." A "planned use development" is one type of special use, defined as "a group of two (2) or more principal buildings designed to be maintained and operated as a unit in single or multiple ownership or control and which has certain facilities in common, such as yards and open spaces, recreation areas, garages and parking areas." [99-10, at 31.] Affordable Recovery Housing first presented its proposal for a special use permit to the City's Plan Commission on May 9, 2012, where it was resolved that Plaintiff would submit a revised application at a second meeting with the Plan Commission on July 11, 2012.

While that process was ongoing, Blue Island Fire Chief (and Defendant in this action) Terry Vrshek conducted a safety inspection of the Mother of Sorrows property. Defendant Vrshek documented his findings in a letter dated May 24, 2012, stating that Affordable Recovery Housing was not following the terms of its five-year plan, and noting that "[t]he primary concern [was] the sprinkler system."[2] [99-5, at 35–36.] Defendant Vrshek ordered Plaintiff to "cease operating the 'recovery housing' * * * until the facility meets the current codes and provide[s] the proper licenses," giving Plaintiff until June 1, 2012 to comply. [99-5, at 35–36.] The letter

_____

[2] In a second later dated June 4, 2012, Fire Chief Vrshek clarified that because the property now had more than 16 residents, it was considered a "large" residential facility, meaning that it had to be protected with an approved sprinkler system. [99-6, at 2–3.]

concluded by informing Plaintiff that it had the right to appeal the eviction notice to the Mayor or to the City Council. [99-5, at 35–36.] At that time, there were 73 men living at the recovery home. According to Plaintiff, after hearing of the eviction notice, these 73 men left the property of their own accord, and Affordable Recovery Housing has since lost contact with most of them.

There is no evidence that Fire Chief Vrshek was aware of Plaintiff's then-pending special use application with the Plan Commission when he conducted his inspection of the property. And by all accounts, Plaintiff did not raise the sprinkler issue in its special use application or its discussions with the Plan Commission at the May 9, 2012 meeting. For example, there is no mention of sprinklers in either Plaintiff's special use application [99-5, at 17–33] or in the minutes from the May 9, 2012 meeting [99-9, at 36–38]. And in a May 10, 2012 email from Blue Island Special Projects Manager Jason Berry to the Mother of Sorrows Property Manager providing detailed advice on how best to revise the special use application in light of what was discussed at the May 9 meeting, Mr. Berry does not mention the sprinkler system either. [99-5, at 9–10.]

Regardless, on May 28, 2012, Affordable Recovery Housing appealed Fire Chief Vrshek's eviction notice to the Blue Island City Council, requesting a three-year accommodation to install the sprinkler system and permission for the residents to continuing living at the property during that time. [See 99-6, at 118–19; 99-7, at 2–5.] (Three days later, Plaintiff filed this lawsuit.) On June 12, 2012, the City Council held a hearing on Plaintiff's appeal. [99-7, at 7–14.] Mayor Peloquin spoke out against Affordable Recovery Housing at the hearing, emphasizing that the only issue for debate was whether eviction was appropriate in light of Plaintiff's failure to comply with the City's fire sprinkler regulations, and that Plaintiff's ongoing discussions with the Plan Commission and the Zoning Board were not relevant to the discussion.

[99-7, at 8–9.] After those involved debated the issue, the City Council approved the Fire Chief's decision by a vote of nine to two, with one absent and two abstentions. [99-7, at 14.]

Shifting back to the special use permit, Affordable Recovery Housing made its second presentation to the Plan Commission on July 11, 2012 as planned, presenting its "revised/updated" planned unit development proposal. [99-9, at 40–41.] The minutes from this meeting reflect the Plan Commission's awareness of Plaintiff's then-pending federal lawsuit and the related sprinkler issue, and one commissioner commented on how "messy" the situation had become. [99-9, at 41.] The Plan Commission tabled the decision until the next regularly scheduled meeting, acknowledging that Plaintiff's motion for preliminary injunction was awaiting resolution in this Court. The Court denied Plaintiff's motion two days later. [37.]

Affordable Recovery Housing then made a third presentation to the Plan Commission on September 5, 2012. [99-9, at 43; 108-3, at 23–26.] The Plan Commission unanimously approved Plaintiff's application, which purportedly included a three-year accommodation to install the sprinkler system and allowed Affordable Recovery Housing to offer overnight accommodations to its residents during that three-year period (assuming other extensive fire-safety protocols were in place).[3] [See 99-10, at 2–4.] Later that same evening, however, Affordable Recovery Housing presented this same proposal to the Blue Island Zoning Board of Appeals. The Board voted in favor of Affordable Recovery Housing's proposed use of the Mother of Sorrows property, but it rejected the requested accommodations regarding the sprinkler system. [See 99-10, at 3.]

Approximately one year later, on September 11, 2013, the Illinois DHS licensed Affordable Recovery Housing as a "recovery house." The following month, Affordable

---

[3] This information is based on the declaration of Andy Norman (Plaintiff's attorney), who attended the September 5, 2012 hearing and offered this information "[t]o the best of [his] recollection." [99-10, at 2.] The minutes from that hearing do not mention the sprinkler system or the three-year accommodation [see 108-3, at 23–26], but Defendants do not appear to object to Mr. Norman's recollection. [109, ¶ 28.]

Recovery Housing filed a motion for partial summary judgment in this Court, arguing that as a state-licensed recovery house, it was governed by the Illinois DHS safety regulations for recovery homes (which do not require sprinkler systems), *not* Blue Island's (which do). In an opinion dated November 17, 2014, the Court granted Plaintiff's motion, concluding that the Illinois DHS safety regulations preempt Blue Island's conflicting fire sprinkler regulations. With the sprinkler dispute resolved, Affordable Recovery Housing began moving men back into the facility the very next month. [106, ¶ 11.] Regarding zoning, it is unclear where the parties stand with respect to Affordable Recovery Housing's special use permit, and what (if any) phase plan is now governing Affordable Recovery Housing's development of the property.

## II.  Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill*., 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chicago*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

Plaintiff has moved for summary judgment on three of the eight counts in its second amendment complaint (Counts IV, V, and VIII), and Defendants have moved for summary judgment on all counts. Because the Court already granted a partial motion for summary judgment in Plaintiff's favor [89], it is important at the outset to determine which claims are still in dispute and which claims have been resolved, mooted, and/or abandoned.

In its November 27, 2014 order [89], the Court effectively mooted the central component of the parties' dispute by concluding that that the Illinois DHS regulations governing recovery homes preempt Blue Island's conflicting sprinkler system requirements. That is, because Affordable Recovery Housing is (as of September 9, 2013) a state-licensed recovery house, it is now subject to the Illinois DHS safety regulations governing recovery homes, under which Plaintiff is not required to install sprinkler systems in its buildings. But while the Court's determination may have resolved the major injunctive component of Plaintiff's lawsuit (*i.e.*,

Plaintiff does not have to install sprinklers), this does not absolve Defendants of liability for any harm that may have occurred previously. The focus of the litigation at this point, then, is (a) whether Defendants' insistence that Plaintiff install a sprinkler system violated any laws, and (b) whether Plaintiff is entitled to any damages for those violations.

Plaintiff's motion for summary judgment (which, unlike its last motion for summary judgment [72], is not advertised as a "partial" motion, despite seeking only partial relief) reflects this change in focus, as Plaintiff has narrowed its focus to three of its original eight claims: its substantial burden claim under both the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Illinois Religious Freedom Restoration Act ("IRFRA"), and its failure-to-accommodate claim under the Fair Housing Amendments Act ("FHAA"). Plaintiff has also revised its damages claim, and now seeks only the following forms of relief:

- A declaration that Defendants' eviction of 73 men from Affordable Recovery Housing in May 2012 constituted a substantial burden on Affordable Recovery Housing's religious exercise under RLUIPA and IRFRA and unlawful discrimination in violation of the FHAA;

- A declaration that Defendants' failure to grant Affordable Recovery Housing a reasonable accommodation by allowing it three years to complete the installation of a Code-approved sprinkler system constituted a substantial burden on Affordable Recovery Housing's religious exercise under RLUIPA and IRFRA and unlawful discrimination in violation of the FHAA; and

- Monetary damages for these violations, to be determined by a jury.

[99, at 1–2.] Plaintiff *did not* move for summary judgment on any of its constitutional claims (Counts I, II, and III) or on its alternative theories of liability under RLUIPA (Counts VI, VII).

By contrast, Defendants have moved for summary judgment on all eight of Plaintiff's claims as enumerated in its second amended complaint [63]. However, in opposing Defendants' motion, Plaintiff did not respond to Defendants' motion as to any of the constitutional claims (Counts I, II, and III) or the "equal terms" claim under RLUIPA (Count VI), and only briefly

responded to Defendants' motion as to the "unlawful exclusion" claim under RLUIPA (Count VII). [See 106.] Although a failure to respond to a motion for summary judgment does not automatically entitle the movant to summary judgment in its favor, it does result in the nonmovant waiving its right to raise any argument on appeal that it did not raise in the district court. *D.S. v. East Porter Cnty. Sch. Corp.*, 799 F.3d 793, 800 (7th Cir. 2015); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (same); see also *Domka v. Portage Cty., Wisc.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." (internal quotations and citations excluded)).

## A.     RLUIPA and IRFRA

Plaintiff claims that Blue Island's actions in imposing and/or enforcing its safety and zoning regulations constituted substantial burdens on its religious exercise in violation of RLUIPA and IRFRA.

Section 2(a)(1) of RLUIPA, which embodies the protections afforded in the First Amendment's Free Exercise Clause, prohibits the government from:

> impos[ing] or implement[ing] a *land use regulation* in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1) (emphasis added). The statute defines "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's

use or development of land (including a structure affixed to the land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc(5). In other words, "a government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 998 (7th Cir. 2006) (citation omitted).

The plaintiff bears the initial burden of proving that the restriction implicates the religious exercise of a person, and that the regulation in question substantially burdens that exercise of religion. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). The burden then shifts to the defendant, who must demonstrate that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest (*i.e.*, the burden is subject to strict scrutiny). See *Vision Church*, 468 F.3d at 996; *World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 533 (7th Cir. 2009).

For many years, the Seventh Circuit described a "substantial burden" under RLUIPA as "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise * * * effectively impracticable." See, *e.g.*, *Eagle Cove Camp & Conference Ctr., Inc. v. Woodboro*, 734 F.3d 673, 680 (7th Cir. 2013); *Vision Church*, 468 F.3d at 996. However, in *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015), the Seventh Circuit recently revisited that standard, noting that "two later decisions of the Supreme Court * * * articulate a standard much easier to satisfy." *Schlemm*, 784 F.3d at 364 (quoting *Holt v. Hobbs*, 135 S. Ct. 853 (2015)); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)). The court explained that the relevant inquiry is whether a particular restriction "seriously violates" the plaintiff's

religious beliefs, including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.*

Illinois' IRFRA statute also prohibits the government from substantially burdening a person's exercise of religion absent a showing that the restriction "(i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15. This standard mirrors the RLUIPA standard, and thus courts often address RLUIPA and IRFRA arguments concurrently. See *Diggs v. Snyder*, 775 N.E.2d 40, 44–45 (Ill. 2002); *World Outreach*, 591 F.3d at 533. One relevant difference, however, is that while RLUIPA prohibits the government from imposing or implementing *land use regulations* that substantially burden religious exercise, IRFRA prohibits the government from burdening religious exercise "even if the burden results from a rule of general applicability." 775 ILCS 35/15.[4]

Here, Plaintiff describes three "substantial burdens" that allegedly resulted from Defendants' imposition of Blue Island's zoning laws.[5]

---

[4] The Illinois legislature passed IRFRA in 1998 after the Supreme Court invalidated the identically-worded Religious Freedom and Restoration Act of 1993 ("RFRA"). See *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007) (citing *City of Boerne v. Flores*, 521 U.S. 507 (1997) (holding that RFRA, as it applied to the states and their subdivisions, exceeded Congress's remedial powers under the Fourteenth Amendment)).

[5] Generally speaking, interpreting exactly which arguments the parties are advancing has proved challenging. This challenge, perhaps, is the byproduct of the parties' cross-motions for summary judgment (where the parties simultaneously advance their own arguments while presaging those of their opponent), years of substantive briefing, multiple iterations of Plaintiff's complaint, the recent mooting of Plaintiff's major injunctive claim, Plaintiff's failure to respond to several of Defendants' arguments, the number of factually and legally similar claims at issue, etc. The result of all of this is that, in addition to the parties' primary arguments, there are remnants of other arguments scattered throughout the parties' briefs. For example, in its prayer for relief, Plaintiff seeks a declaration that Defendants' eviction of 73 men amounted to a substantial burden, but Plaintiff does not present a detailed argument in support of this theory, focusing instead on the "legal impossibility" of its special use application as the basis for its substantial burden claim. [99, at 1–2.] In preparing this order, the Court has considered all of the parties' arguments presented in their summary judgment briefs, regardless of the level of development.

*First*, Plaintiff argues that Blue Island's eviction of its 73 residents substantially burdened its ability to exercise its religion by effectively rendering religious exercise impracticable. However, the City's eviction was pursuant to its fire safety code, not its zoning ordinance. Because Blue Island was not "impos[ing] or implement[ing] a land use regulation" (*i.e.*, the City was not acting pursuant to a "zoning or landmarking law"), this action falls outside of the regulatory scope of RLUIPA. See, *e.g.*, *St. John's United Church of Christ*, 502 F.3d at 641–42 (city's eminent domain action did not involve a "land use regulation" and thus fell beyond the scope of RLUIPA); *Vision Church*, 468 F.3d at 997–98 ("[A]n annexation statute is not itself a 'zoning' or 'landmarking' regulation and its application therefore does not constitute government action covered by RLUIPA."); *Second Baptist Church of Leechburg v. Gilpin Twp., Pa.*, 118 F. App'x 615, 617 (3d Cir. 2004) (mandatory sewer tap requirement did not trigger RLUIPA because it was not enacted pursuant to a zoning or landmarking law).

Regarding IRFRA—which, again, prohibits the government's restriction of the free exercise of religion generally, not only with respect to land-use restrictions—Plaintiff says that the eviction was a substantial burden on its free exercise of religion because once the residents lost their overnight lodging privileges, program attendance plummeted, effectively putting an end to operations.

Defendants raise two objections. First, Defendants argue that despite the restriction on overnight lodging, Affordable Recovery Housing was still entitled to carry on with the other aspects of its recovery program such as recovery support services, meals and recreation, job training, medical and dental referrals, and religious outreach. While this is true on paper, in reality, Blue Island effectively pulled the plug on these daytime recovery programs by prohibiting overnight lodging. As the Seventh Circuit recently noted, while "[i]t's hard to

imagine a vaguer criterion for a violation of religious rights" than the "substantial burden" standard, preventing an organization from using its facility to serve the religious objectives of the organization "cannot be thought to have imposed a merely insubstantial burden on the organization." *World Outreach Conference Ctr. v. City of Chicago*, 787 F.3d 839, 843 (7th Cir. 2015).

Defendants also argue that their action was not the cause of the substantial burden—that is, that any "substantial burden" was self-imposed because Plaintiff prematurely moved residents onto the property without first obtaining the necessary permits and approvals. See *Family Life Church v. City Of Elgin*, 561 F.Supp.2d 978, 988 (N.D. Ill. 2008) ("Much of the burden on Family Life was self-imposed by its premature opening of the shelter before seeking a Permit and its then having to close down the shelter during the pendency of the Permit application. Homeless shelters cannot be created overnight, and the cogs of local land use approval require time to turn."). As the argument goes, if Plaintiff had not moved residents onto the property prematurely, then the City of Blue Island's enforcement of its sprinkler code would not have resulted in eviction, and thus would not have presented a substantial burden.

The question here is really one of timing. That is, the "government action" at issue is the same in all of Plaintiff's theories: Blue Island's enforcement of its fire sprinkler regulation. And (as explained in more detail below in response to Plaintiff's second theory of liability under IRFRA), had Blue Island strictly enforced its fire sprinkler regulation from the outset by denying Affordable Recovery Housing the right to occupy the property until it was brought up to code, that action would not have constituted a substantial burden under IRFRA. To hold otherwise would mean that a religious organization in the market for a facility could point to any number of condemned buildings and argue that the cost of bringing the building up to code presents a

"substantial burden."[6] The question, then, is whether government action that doesn't impose a substantial burden at one point in time *might* impose a substantial burden at a later time. Without answering that question generally, Defendants answer "no" as to the facts of this case, arguing that even though Blue Island's delayed enforcement arguably had a more significant impact (*i.e.*, the 73 overnight residents were evicted, as opposed to denied overnight-lodging rights from the outset), any added burden is attributable to Plaintiff's own actions. The Court agrees.

Plaintiff's only rejoinder is that the Blue Island *authorized* Affordable Recovery Housing to move 40 overnight residents onto the property before choosing to enforce the sprinkler requirement, telling Plaintiff that they would address the sprinkler issue at a later time. See *Petra*, 489 F.3d at 851 ("[O]nce the organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship on it." (citing *New Berlin*, 396 F.3d at 900)). But while the parties dispute whether Blue Island actually authorized Plaintiff to move 40 overnight residents onto the property, they do not dispute that, at the time of eviction, Plaintiff had 73 residents living at the facility. At that point, Plaintiff—which also had fallen behind on many of its representations regarding code compliance as presented in its five-year plan, including all representations regarding the installation of fire sprinklers—had nearly double the number of (allegedly) approved men residing at its property without having any written instrument reflecting the City's knowledge or approval of its actions. Much like the plaintiff in

---

[6] See, *e.g.*, *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 850–51 (7th Cir. 2007) (a ban on churches in an industrial zone "cannot in itself constitute a substantial burden on religion, because then every zoning ordinance that didn't permit churches everywhere would be a prima facie violation of RLUIPA."); *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005) (placing religious institutions in *too* favorable a position in relation to other land users runs the risk of "run[ning] afoul of the clause of the First Amendment that forbids Congress * * * to establish a church"); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("While [the restrictions] may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, they do not render impracticable the use of real property in Chicago for religious exercise, much less discourage churches from locating or attempting to locate in Chicago.").

*Family Life Church v. City of Elgin*, Affordable Recovery Housing put the cart before the horse, accelerating its operations into full force before dotting its i's and crossing its t's with the City. Even accepting Plaintiff's story that the City extended Affordable Recovery Housing some sort of accommodation by allowing it to inhabit the building in violation of the fire code (provided that it complied with the terms of its five-year plan and kept the number of overnight residents to a maximum of 40), because Affordable Recovery Housing violated the terms of that agreement, it would be unfair to label the eviction as the "substantial burden" created by the City's enforcement of its fire code. To hold otherwise would incentivize organizations such as Plaintiff's to put progress before safety, which not only jeopardizes the security of property and those within, but also places the government in the difficult position of having to slow the progress of these organizations in order to protect them. For these reasons, Plaintiff's IRFRA claim must fail.

In any event, even if Blue Island's enforcement of its fire safety code did substantially burden Plaintiff's free exercise of religion, Defendants can still prevail on summary judgment by establishing that they acted in furtherance of a compelling governmental interest and that their action was the least restrictive means of furthering that interest. 775 ILCS 35/15.

As to the "compelling governmental interest" inquiry, compelling governmental interests are "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Here, Blue Island's sprinkler regulations are part of its Life Safety Code, which mirrors the nationally recognized and widely adopted National Fire Protection Association Life Safety Code, published by the National Fire Protection Association. The City's interest is that of reducing fires and protecting life and property in the City, including the lives and property of Plaintiff and its clients. [See 18-1, 2012 National Fire Protection Association

Life Safety Code Ch. 32–33 (justifying the increase in regulation for "small" and "large" facilities: "As the number of residents put at risk by fire increases, the requirements naturally become more strict.").] The Court concludes that City's adoption and enforcement of its sprinkler regulations were in furtherance of a compelling governmental interest.

As to the "least restrictive means" inquiry, adopting and enforcing a nationally recognized fire safety code is strong evidence that a city is exercising the least restrictive means of ensuring fire safety. The relevant question here is whether Blue Island could have achieved, to the same degree, its compelling interest in reducing fires and protecting life and property by *omitting altogether* the fire sprinkler requirement in the Life Safety Code—a code that establishes the "*minimum requirements* [to] provide a reasonable degree of safety from fire in existing buildings and structures." *Hadix v. Johnson*, 367 F.3d 513, 520 n.9 (6th Cir. 2004) (emphasis added). While Affordable Recovery Housing surely could achieve *some* level of safety without a sprinkler system, it is unreasonable to say that it could achieve the same level without a major component of what the Code requires as its minimum. See 2006 National Fire Protection Association Life Safety Code Ch. 1.2 ("The purpose of this Code is to provide *minimum requirements*, with due regard to function, for the design, operation, and maintenance of buildings and structures for safety to life from fire. Its provisions will also aid life safety in similar emergencies." (emphasis added)).

Plaintiff suggests that it devised a viable alternative to a sprinkler system in what it calls its "comprehensive fire safety protocol," in which it planned to employ on-duty floor managers, execute regular fire drills, and install evacuation signage as a means of ensuring adequate fire safety for the building and its residents.[7] Plaintiff points to testimony from Blue Island fire

---

[7] Plaintiff presented its "comprehensive fire safety protocol," in a proposed settlement agreement dated December 5, 2012. [See 99, ¶ 52;99-8, at 19–24.] Plaintiff has not submitted any evidence that this

inspector Robert Copp, who testified that Plaintiff's plan could serve as "a temporary fix until the sprinkler systems would be put in." [99, at 26–27.] But that is not enough to create a triable issue of fact as to whether Plaintiff's protocol was a less restrictive alternative to the City's fire sprinkler requirement. Again, the City's Life Safety Code mirrored a widely adopted standard for fire safety. It is unreasonable to say that Blue Island should have deviated from this nationally-recognized safety standard for an indefinite period of time based on a make-shift proposal (one that Blue Island's fire chief deemed, at best, a "temporary fix"), especially considering that, at the time of the eviction, Plaintiff was non-compliant with its five-year plan for the development of the property and was housing overnight guests in numbers that far exceeded the City's approval by any measure. While it is not Plaintiff's burden to devise a less restrictive means, its attempt to do so is unavailing, and does not dissuade the Court from its conclusion that Blue Island's adoption and enforcement of the Life Safety Code was the least restrictive means of

---

protocol was an adequate substitute to the Life Safety Code for reducing fires and protecting life and property. The scant support in the record for this theory comes from the declaration of architect Edward M. Yung, who claims to be "familiar with codes related to fire safety." [99-5, at 2.] Mr. Yung concluded that the required fire sprinkler system was not necessary because the construction of the building, coupled with its alarm system, were sufficient to address fire safety. He also suggested several upgrades, including a night watchman (preferably a retired fireman), hard-wire smoke detectors with battery backups outside and inside each sleeping quarters' room, and escape ladders. Mr. Yung's averments are unhelpful here for several reasons. First, he failed to engage in any substantive comparison between the requirements of Blue Island's Life Safety Code as compared either to Affordable Recovery Housing's "comprehensive fire safety protocol" or his own assessment of whether the buildings are "fire safe." Indeed, Affordable Recovery Housing used Mr. Yung to draft a response letter to Fire Chief Vrshek's May 24, 2012 eviction letter, *not* to opine whether its "comprehensive fire safety protocol" is a less restrictive means of reducing fires and protecting life and property. Second, in that same regard, Mr. Yung speaks primarily of "life safety," and says little to nothing about reducing fires or the protection of property. For example, he says that "smoke detectors are more critical to life safety than a sprinkler system because they can detect the dangers of a fire faster than a sprinkler head can and they can notify all of the people in the building of the fire, allowing them to vacate the building more quickly." But, of course, a sprinkler system is primarily a tool for fire *suppression*, not fire *detection*. By limiting his focus to life safety, Mr. Yung ignores Blue Island's interests in reducing fires and protecting property. Third, to the Court's knowledge, Plaintiff has not disclosed Mr. Yung as an expert on these matters, and thus his tangentially-related opinions are of little relevance to the Court's analysis.

reducing fires and protecting life and property.[8] This provides an alternate reason as to why Plaintiff's claim must fail.

**Second**, Plaintiff argues that Defendants substantially burdened its religious exercise by denying its accommodation requests,[9] which included requests for (a) a three-year extension of time to complete the installation of an approved sprinkler system, and (b) permission for the residents to stay on site pending completion of the sprinkler-system installation. But again, although Plaintiff did present its request for accommodation to the zoning board (in conjunction with its application for a special use permit), that does not mean that the City's action was pursuant to a zoning or landmarking law; the regulation at issue is still Blue Island's requirement that Affordable Recovery Housing install a fire sprinkler system. A party cannot convert a municipality's regulatory action into a zoning action simply by raising the issue with a zoning committee. Because Blue Island did not act pursuant to a "zoning or landmarking law" in denying Plaintiff's requested accommodation, this action also falls outside of the regulatory scope of RLUIPA.

Regarding IRFRA, Blue Island's denial of Plaintiff's accommodation request did not substantially burden Plaintiff's free exercise of religion. Plaintiff's request for an accommodation came *after* the eviction (taking the added burden of the eviction process off the table), and so the practical effect of the refusal to accommodate was that Plaintiff was denied the right to house overnight guests in a building that lacked a code-approved fire sprinkler system—*i.e.*, the same burden Affordable Recovery Housing would have faced had Blue Island denied them access to

---

[8] Plaintiff mentions that it conducted three fire drills in June and July 2012 in which the facility's 25, 38, and 41 residents were evacuated within three minutes. [99, ¶ 49.] Plaintiff does not tie this fact to any particular legal argument, but to the extent that it is meant to show that there are less restrictive means of reducing fires and protecting life and property, it is unavailing.

[9] This argument only applies to the special use permits filed (or argued) after the eviction notice. Prior to the eviction notice, Plaintiff's special use permit did not request accommodations regarding the City's sprinkler regulations.

the building from day one. But again, this cannot constitute a substantial burden; otherwise a religious organization in the market for a facility could point to any number of condemned buildings and argue that the cost of bringing the building up to code presents a substantial burden. See, *e.g.*, *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 850–51 (7th Cir. 2007).

Plaintiff disagrees with this premise, arguing that "delay, uncertainty, and expense" alone are enough to create a substantial burden. Plaintiff relies on an out-of-context application of the Seventh Circuit's rule in *New Berlin*. In that case, a religious organization owned a large parcel of land and they petitioned the city to rezone a portion of the land from residential to institutional to allow them to build a church on the property. *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 899–900 (7th Cir. 2005). The city expressed a willingness to rezone the property, and the only holdup was the city's concern that subsequent owners of the property might use the property's institutional zoning for nonreligious institutional use. To allay the city's concern, the plaintiff proposed a planned-unit-development overlay ordinance that would limit the parcel to church-related uses. Despite being presented with a workable solution to its concern, the city still denied the plaintiff's request, such that the plaintiff's only options were (a) to search for a new parcel of land on which to build their church, or (b) to continue filing applications with the city to find an agreeable work-around to the issue. *Id.* at 900. In that instance, the Seventh Circuit held that "in either case there would have been delay, uncertainty, and expense," such that the city's denial of the religious organization's rezoning application constituted a substantial burden. *Id.* at 901.

Plaintiff tries to liken its case to the plaintiff in *New Berlin*, noting that it had already rented and invested in the Mother of Sorrows property, and that once the City of Blue Island

denied its special use application (including its requests for accommodation), Plaintiff's options were either (a) to find a new property to rent, or (b) to continue filing revised permit applications in search of a workable arrangement with the City. Plaintiff further compares its situation to that of the *New Berlin* plaintiff by arguing that the City of Blue Island's only holdup with the special use permit was its concern over the sprinkler system (as evidenced by the results of the Zoning Board of Appeals vote on September 5, 2012), and that, at some point thereafter, Plaintiff presented the City with a viable workaround that addressed the City's concern but the City nonetheless rejected the idea. But in *New Berlin*, the court was able to conclude, as a matter of law, that the plaintiff's proposal *was* a viable solution to the city's concern—*i.e.*, the proposed planned-unit-development overlay ordinance unarguably remedied the issue, such that the mayor's demand that the plaintiff try again meant that he was either "confused about the law" or "playing a delaying game," thus presenting a substantial burden. *Id.* at 899. Here, there is no evidence that Plaintiff's proposed accommodations were sufficient to allay the City's concerns regarding the safety of the building and its residents—and, indeed, developing a workaround to a zoning concern is leagues apart from developing a workaround to a national fire safety code— and so *New Berlin* doesn't apply. Instead, the "delay, uncertainty, and expense" that Affordable Recovery Housing faced is the same that any organization, religious or otherwise, would have faced had it wanted to inhabit a building that was not up to code.

But again, even if the City's refusal to accommodate Plaintiff did impose a substantial burden on its free exercise of religion, for the reasons explained above, the City's adherence to its fire safety code was the least restrictive means of reducing fires and protecting life and property. For these reasons, Plaintiff's second theory of liability also fails.

**Third**, Plaintiff argues that it was substantially burdened by the City's "frivolous" and "bad faith" demand that it apply for a special use permit. Specifically, Plaintiff argues that (1) planned unit development permits are only for new developments, (2) zone R-1 does not allow for transitional homes or recovery homes as special uses, and thus any attempt to gain approval for such a use is a "legal impossibility," and (3) Affordable Recovery Housing is a legal non-conforming use and thus need not apply for a special use permit. While these arguments do invoke actions pursuant to a zoning ordinance (and thus fall within the scope of regulated activity under RLUIPA), they do not constitute substantial burdens under RLUIPA or IRFRA.

Generally speaking, RLUIPA does not provide religious institutions with immunity from land use regulations, nor does it relieve religious institutions from applying for variations, special permits, or exceptions to land use regulations. See *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003) (denying claim that zoning regulation prohibiting churches in certain areas violated RLUPIA and noting that "[o]therwise, the compliance with RLUPIA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations. Unfortunately for [the churches], no such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise.").

In support of its first and second arguments, Plaintiff relies on an exception to this general rule articulated by the Seventh Circuit in *World Outreach*, where the City of Chicago sent the plaintiff on a fool's errand, requiring it to apply for a special use permit so that it could operate as a community center in a particular district, but then rezoning the district to a category where community centers are not allowed, thereby making it impossible for the plaintiff to

obtain the necessary permit. *World Outreach*, 591 F.3d at 536–37. The Seventh Circuit held that the City's runaround constituted a substantial burden. Plaintiff likens Blue Island's zoning requirements to those imposed by the City of Chicago in *World Outreach*, arguing that it was (and is) impossible for it to comply with Blue Island's zoning ordinance. The Court disagrees.

This case is a far cry from the facts of *World Outreach*. As to Plaintiff's first argument, Plaintiff relies solely on emails to support its proposition that planned unit developments are reserved only for new developments (rather than remodels) without providing any textual support within the zoning ordinance itself. And upon review, the Court cannot find any textual support for this assertion either. But regardless of what the zoning ordinance says, Blue Island *endorsed* Plaintiff's pursuit of a special use permit as a planned unit development, and both the Plan Commission and the Zoning Board of Appeals *approved* Plaintiff's special use proposal. Blue Island's demonstrated willingness to allow Plaintiff to proceed as a planned unit development distinguishes this case from *World Outreach*.

Nor does Plaintiff's second argument trigger the *World Outreach* exception. Even though Blue Island's zoning ordinance does not expressly provide for "transitional housing" or "recovery housing" in any particular zoning district—including in Plaintiff's R-1 district [see 99-10, at 41–42]—that does not mean that such a use is *incompatible* with the zoning ordinance. Indeed, the zoning ordinance anticipates that "there are certain uses which, because of their unique characteristics, cannot be properly classified in any particular district," which is the "purpose" of having special use permits. [See 99-10, at 88; 107, ¶ 13.] And the "planned unit development"—*i.e.*, a group of two or more principal buildings designed to be maintained and operated as a unit—is one of the special uses permitted in R-1 zones, and Affordable Recovery Housing's intended mixed use of the Mother of Sorrows property falls comfortably within that

definition. [See 107, ¶ 65.] And again, Blue Island has both endorsed and approved Plaintiff's operation of a recovery home as a planned unit development, further distancing this case from *World Outreach*.

Plaintiff's argument regarding non-conforming uses also is unavailing. Plaintiff properly notes that Blue Island exempts pre-existing, non-conforming structures and land uses from complying with certain new and amended code regulations, assuming that the structure or land use existed lawfully when the new regulations were adopted. But the Blue Island zoning ordinance also says that "[n]o non-conforming use shall be changed to another non-conforming use." [99-10, at 74.] For decades, the Mother of Sorrows property was used primarily for educational purposes, where the only overnight residents were the Mantellate Sisters who occupied (and continue to occupy) a building on the Mother of Sorrows property that is not at issue in this lawsuit. Plaintiff's proposed use of the property—namely, its introduction of a sizeable transient population of overnight residents in previously non-residential buildings—presents a change in the property's use, which is the reason the City requested that Plaintiff submit a special use permit in the first place. Because Plaintiff's intended uses of the Mother of Sorrows property exceeded the prior uses of that property, Plaintiff cannot benefit from the City's non-conforming-use policy.[10] See also *Affordable Recovery Housing v. City of Blue Island*, 2012 WL 2885638, at *6–8 (N.D. Ill. July 13, 2012) (addressing this issue at length at the preliminary injunction phase).

---

[10] Defendants also argued that the Mantellate Sisters abandoned any non-conforming uses of the property because the property discontinued these uses for a period exceeding six months. [See 99-10, at 74.] Defendants' argument prompted a separate reply brief from Plaintiff [see 111-1], which the Court has read and considered. Ultimately, however, the Court need not address this argument, having concluded that Plaintiff's proposed use of the Mother of Sorrows property departed from any prior uses so as to preclude Plaintiff's invocation of the non-conforming-use doctrine.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's RLUIPA and IRFRA claims.

**B.    First Amendment**

Plaintiff also argues that that Blue Island's zoning and safety codes infringe upon its First Amendment rights to the free exercise of religion and the freedom of association. Defendants have moved for summary judgment on both claims. Plaintiff did not respond to Defendants' motion for summary judgment as to either claim [see 106 (no mention of First Amendment)], and thus has waived all arguments in opposition. See *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999).

As an initial matter, the Court notes that because RLUIPA is interpreted broadly to the "maximum extent" permitted by the Constitution, see 42 U.S.C. § 2000cc-3(g), federal courts often are able to avoid addressing constitutional claims that mirror claims brought pursuant to RLUIPA. Indeed, "'federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions.'" *Kroger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008) (declining to consider constitutional claims that were paired with a RLUIPA claim, noting that RLUIPA offers heightened protections) (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) (same)); see also *World Outreach*, 591 F.3d at 534–35 ("[W]e cannot see any point in a plaintiff's pitching a religious discrimination claim on *any* provision of the Constitution, rather than just on the [RLUIPA] statute."); *cf. Vision Church*, 468 F.3d at 996 (collapsing its analysis of RLUIPA and First Amendment claims). Based on this constitutional

avoidance doctrine, the Court need not revisit Plaintiff's RLUIPA-eligible claims in assessing Plaintiff's First Amendment claims. *E.g.*, *Nelson v. Miller*, 570 F.3d 868, 877 (7th Cir. 2009).

However, as discussed above, certain of Plaintiff's RLUIPA arguments did not involve a zoning or landmarking law (*i.e.*, claims based on Blue Island's fire sprinkler requirements), and thus fell beyond the scope of RLUIPA. The Court now assesses Plaintiff's First Amendment claims as to those arguments.

### 1.      Free Exercise

"'Under the Free Exercise Clause of the First Amendment of the United States Constitution, made applicable to state and local governments by the Fourteenth Amendment, no law may prohibit the free exercise of religion.'" *Vision Church*, 468 F.3d at 996 (quoting *Civil Liberties for Urban Believers*, 342 F.3d at 762–63). Courts assessing a Free Exercise claim must determine whether the law being challenged is "neutral and of general applicability," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), and the general rule is that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997). Indeed, the Seventh Circuit has repeatedly held that "'no Free Exercise Clause violation results where a burden on religious exercise is the *incidental effect* of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest.'" *Vision Church*, 468 F.3d at 998 (emphasis added) (quoting *Civil Liberties for Urban Believers*, 342 F.3d at 763).

Such is the case here. The fire sprinkler regulation at issue comes from Blue Island's Life Safety Code, which mirrors the widely adopted National Fire Protection Association Life Safety Code. Blue Island's Life Safety Code is neutral and applies generally to all properties in Blue

Island, whether used for religious purposes or not. The alleged burden to Plaintiff's religious exercise stemming from the City's enforcement of this code is the fact that Affordable Recovery Housing was not allowed to board overnight guests at its property (although it was entitled to continue all other aspects of its operation). This burden to Plaintiff's religious exercise—assuming that overnight lodging is part of Plaintiff's religious exercise—was only incidental to the City's enforcement of its safety provisions. Sprinkler regulations do not directly impact the exercise of religion or otherwise target religious activity; they directly impact the safety and habitability of a property. The fact that the City's enforcement of its safety codes may have indirectly (or consequently) impacted Plaintiff's exercise of religion does not make this claim actionable under the Free Exercise Clause.

Additionally, the burden on Plaintiff was not a substantial one. Within the First Amendment context, a "substantial burden" exists when the government puts "'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Vision Church*, 468 F.3d at 997 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987)). The City's enforcement of its safety regulations did not require Plaintiff to violate its religious beliefs; it merely required Plaintiff to install a sprinkler system. Again, any effect on religious exercise was merely incidental to the enforcement of a facially neutral, generally applicable safety regulation. See *Vision Church*, 468 F.3d at 998 (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("[W]e agree that 'substantial burden' requires something more than an incidental effect on religious exercise.")).

For these reasons, Blue Island's enforcement of its sprinkler regulations did not violate Plaintiff's First Amendment right to the free exercise of religion. Defendants are entitled to summary judgment on this claim.

### 2.     Freedom of Association

The freedom of association "is implicit in the First Amendment's protections." See *Laborers Local 236, AFL-CIO v. Walker*, 749 F.3d 628, 638 (7th Cir. 2014); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) ("The reason we have extended First Amendment protection in this way is clear: The right to speak is often exercised most effectively by combining one's voice with the voices of others."). The constitutionally protected right to freedom of association consists of two categories: "(1) the freedom to maintain certain intimate human relations, such as marriage, procreation, education of one's children, and cohabitation with one's relatives and (2) the right to associate to engage in activities protected by the First Amendment, such as speech, assembly, petition for redress of grievances, and exercise of religion." *Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1072 (7th Cir. 2013). The rights at issue here fall into the latter category, making it essentially a carbon copy of Plaintiff's free exercise claim.

Plaintiff's freedom of association claim fails for the same reasons that its free exercise claim fails. Blue Island's sprinkler regulations are facially neutral and do not prevent religious organizations from forming or meeting. While Blue Island's sprinkler requirement might make it more difficult to engage in certain religious activities, these are *incidental* burdens on Plaintiff's right of freedom of association, not direct and substantial ones. See *Civil Liberties for Urban Believers*, 342 F.3d at 765; *Laborers Local 236*, 749 F.3d at 639 ("[T]he First Amendment does not require the state to maintain policies that allow certain associations to thrive."); *Johnson v. City of Kankakee*, 260 F. App'x 922, 925–26 (7th Cir. 2008) (affirming a grant of summary judgment for defendant where an ordinance "d[id] not infringe on [the freedom of association] directly"); *Hameetman v. City of Chicago*, 776 F.2d 636, 643 (7th Cir. 1985) ("[S]tate and local

regulations are not unconstitutional deprivations of the right of family association unless they regulate the family directly * * *."). And to the extent that Blue Island's sprinkler regulations indirectly regulate the freedom to associate, such regulation is motivated not by any disagreement that Blue Island might have with recovery homes or other religious organizations, but rather by such legitimate, practical concerns as fire safety. See *Civil Liberties for Urban Believers*, 342 F.3d at 765. Additionally, the City's enforcement of its sprinkler regulations only prevented Plaintiff from housing overnight guests; all program participants were still entitled to associate and exercise their religious beliefs so long as those acts did not involve overnight lodging. This is further evidence that the City's sprinkler regulation does not infringe upon Plaintiff's freedom of association. Defendants are entitled to summary judgment on this claim.

### C.      Fourteenth Amendment Procedural Due Process

Plaintiff alleges that Defendants have violated its due process rights under the Fourteenth Amendment by (1) imposing a sprinkler requirement that does not exist in the Life Safety Code, (2) authorizing the Fire Chief or any other Blue Island administrator to evict Plaintiff under the circumstances, (3) authorizing the Fire Chief or any other Blue Island administrator to summarily shut down Plaintiff's business under the circumstances, and (4) requiring Plaintiff to obtain a special land use permit and/or to submit to a planned unit development. Defendants have moved for summary judgment on this claim, and Plaintiff did not offer any arguments in response.

As the Seventh Circuit has said on multiple occasions, "Federal courts are not boards of zoning appeals [and] the procedures 'due' in zoning cases are minimal." *Civil Liberties for Urban Believers*, 342 F.3d at 767 (quoting *River Park v. City of Highland Park*, 23 F.3d 164 (7th Cir. 1994)). As Plaintiff well knows, Blue Island provides mechanisms for objecting to and/or appealing all decisions related to its zoning and safety regulations. Plaintiff availed itself of these

mechanisms on repeated occasions, presenting its zoning proposals and accommodation requests to both the Plan Commission and the Zoning Board of Appeals. Similarly, as explained in the eviction letter, Plaintiff was entitled to appeal the Fire Chief's eviction notice to the City Council, which Plaintiff did. There is no evidence that the City failed to provide adequate review procedures for Plaintiff's zoning applications and accommodation requests, nor is there any evidence that Plaintiff was denied the opportunity to a full and fair hearing in each instance. See *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))). Plaintiff has not provided any evidence to the contrary, and has waived all arguments in opposition. It is unclear what process or procedure Plaintiff feels it was denied; Plaintiff's allegations read more like one dissatisfied with the results of its protestations, not the procedures by which those results came to pass. Based on the undisputed facts, the Court concludes that Defendants provided Plaintiff with adequate due process regarding all issues related to the City's zoning and safety regulations. Defendants are entitled to summary judgment on this claim.

### D.    RLUIPA: Equal Terms and Unlawful Exclusion

In addition to its "substantial burden" claim under RLUIPA, Plaintiff also alleges that Defendants' actions violated the "equal terms" and "unlawful exclusion" provisions of RLUIPA. Defendants have moved for summary judgment on both claims. Plaintiff provided a short response on the "unlawful exclusion" claim, but did not address the "equal terms" claim at all.

#### 1.    Equal Terms

Section 2(b)(1) of RLUIPA says that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms

with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). According to the Seventh Circuit, a regulation will violate the "equal terms" provision of RLUIPA only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated as to the accepted zoning criteria. *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367 (7th Cir. 2010) (en banc). To prevail on an equal terms claim, Plaintiff must show that religious and secular land uses have not been treated the same from the standpoint of an accepted zoning criterion. See *Truth Foundation Ministries, NFP v. Vill. of Romeoville*, 2016 WL 757982, at *14 (N.D. Ill. Feb. 26, 2016) (citing *Irshad Learning Ctr. v. County of DuPage*, 937 F. Supp. 2d 910, 936 (N.D. Ill. 2013)).

The Seventh Circuit recognizes "three distinct kinds of Equal Terms statutory violations: (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless 'gerrymandered' to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statue that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions." *Irshad*, 937 F.Supp.2d at 932 (citing *Vision Church*, 468 F.3d at 1003).

Plaintiff did not respond to Defendants' motion for summary judgment on this claim, so the Court cannot readily discern which "kind" of statutory violation Plaintiff believes occurred here. Nevertheless, because Blue Island's zoning ordinance is facially neutral and there is no evidence of "gerrymandering," the first and second categories are off the table.

As to the third category, Defendants argue that Blue Island does not selectively enforce its zoning laws against religious institutions. Because RLUIPA is only concerned with municipal action taken pursuant to a zoning or landmarking law, the only relevant "enforcement" here is Blue Island's requirement that Plaintiff obtain zoning approval for its use of the Mother of

Sorrows property, which Blue Island suggested would best be accomplished by obtaining a special use permit as a planned unit development. In support of their argument, Defendants point to the fact that another individual (Debra Hunter) sought to use the Mother of Sorrows property for non-religious purposes (*i.e.*, a women's shelter, a vocational training center, and a retail sales and services operation) just before Plaintiff moved onto the property. In response to Ms. Hunter's expressed interest in the property, Blue Island advised Ms. Hunter to proceed with her project as a planned unit development—*i.e.*, the same advice it offered to Plaintiff. [See 107, ¶¶ 47–49.] In other words, Blue Island applied its zoning laws equally in two contemporaneous instances involving one religious and one non-religious organization. The record also reflects numerous other instances where Blue Island required non-religious institutions to obtain special use permits in various zoning districts, including R-1. [See 107, ¶¶ 9–12.] Based on these undisputed facts, Plaintiff cannot show that Blue Island imposed a land use regulation in a manner that treated it, as a religious organization, on less than equal terms with a non-religious organization.[11] Defendants are entitled to summary judgment on this claim.

## 2. Unlawful Exclusion

Plaintiff also alleges that Blue Island's zoning code violates § 2000cc(b)(3) of RLUIPA, which provides that "[n]o government shall impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. §§ 2000cc(b)(3)(A)–(B). As to the latter prong, "[w]hat is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations." *Vision Church*, 468

---

[11] Plaintiff alleges that it was treated differently than another recovery program in Blue Island (called Guildhaus), because the City gave the Guildhaus three years to install a sprinkler system. [99, at 12.] Because this relates to the City's enforcement of its safety regulations (not its zoning or landmarking laws), it falls beyond the scope of RLUIPA, and thus cannot form the basis of an equal terms claim.

F.3d at 990. But the Court need not address reasonableness here, as Plaintiff invokes only the first prong, arguing that "the City provides *no zone or district* in which ARH's present and future uses are permitted, and thereby totally excludes and unreasonably limits ARH from the City." [63, at 23–24 (emphasis added).] Defendant has moved for summary judgment on this claim.

As explained in detail above, Blue Island has authorized Affordable Recovery Housing to operate a recovery home at the Mother of Sorrows property, which is zoned R-1, by obtaining a special use permit as a planned unit development. The fact that the City's zoning ordinance does not expressly list "recovery homes" as a type of special use is irrelevant because the City has endorsed Plaintiff's classification a planned unit development, and both the Plan Commission and the Zoning Board of Appeals have approved Plaintiff's proposed use of the property (even though the Zoning Board of Appeals ultimately refused to grant Affordable Recovery Housing its requested accommodation regarding the sprinkler system, which has nothing to do with the propriety of its zoning request). These facts alone doom Plaintiff's claim under § 2000cc(b)(3)(B). And as further proof that Blue Island does not exclude recovery homes, Plaintiff concedes that it "is not the only recovery home, transitional housing program or sober living house in Blue Island" and that "Blue Island is known for having *a lot* of living sober homes." [107, ¶ 22 (emphasis added).]

And even if the Court were to construe Plaintiff's claim broadly to advance an argument under § 2000cc(b)(3)(A), there is nothing unreasonably limiting about requiring Affordable Recovery Housing to obtain a special use permit. Again, RLUIPA does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variations, special permits, or exceptions to land use regulations. See *Civil Liberties for Urban Believers*, 342 F.3d at 762.

Based on these facts, the Court concludes that Blue Island's zoning code does not completely or unreasonably exclude recovery homes from its districts. Defendants are entitled to summary judgment on this claim as well.

### E. Fair Housing Amendments Act

Plaintiff alleges that Blue Island's rejection of Affordable Recovery Housing's request for an accommodation allowing it three years to install an approved fire sprinkler system (and its related request to allow its residents to remain living on site during that three-year period) constituted unlawful discrimination in violation of the FHAA.

The FHAA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Enacted in 1988, the FHAA extended the scope of the statute to cover persons with disabilities. See *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006). The types of discrimination proscribed by the statute include "a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); see also *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003) ("[The FHA] require[s] a public entity to reasonably accommodate a disabled person by making changes in rules, policies, practices or services as is necessary to provide that person with access to housing that is equal to that of those who are not disabled.").

To prevail on a failure-to-accommodate claim, a plaintiff must show (1) that the requested accommodation is reasonable, and (2) that the accommodation is "necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market." *Wisc. Cmty. Servs.*, 465 F.3d at 749.

Whether a requested accommodation is "reasonable" is a "highly fact-specific inquiry and requires balancing the needs of the parties," where "[a]n accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Wisc. Cmty. Servs.*, 465 F.3d at 749 (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)).

The "necessary" requirement is linked to the goal of "equal opportunity," and a plaintiff must show that, "without the accommodation, the plaintiff will be denied an equal opportunity to obtain the housing of her choice." *Wisc. Cmty. Servs.*, 465 F.3d at 749. In other words, accommodations qualify as necessary only when "the rule in question, if left unmodified, hurts handicapped people *by reason of their handicap*, rather than * * * by virtue of what they have in common with other people, such as a limited amount of money to spend on housing." *Id* (emphasis added). For example, in *Good Shepherd*, the Seventh Circuit held that a city's act of shutting off the water supply to a group home did not violate the FHAA because "[c]utting off the water prevents anyone from living in a dwelling, not just handicapped people." *Good Shepherd*, 323 F.3d at 562; see also *Wisc. Cmty. Servs.*, 465 F.3d at 749 ("Put differently, the plaintiff's accommodation claim [in *Good Shepherd*] failed because the disability suffered by the group home's residents did not deny them an equal opportunity to obtain housing.").

Plaintiff spends considerable space arguing about the reasonableness of its accommodation requests, explaining how it has devised a comprehensive fire safety protocol that could ensure adequate fire safety until Plaintiff is able to install the sprinkler system. But the Court need not assess whether Plaintiff's accommodation requests are reasonable because Blue Island's fire sprinkler requirement does not hurt handicapped people *by reason of their handicap*. The Seventh Circuit came to the same conclusion in a factually-similar case, holding that a

municipality did not have to adjust its zoning and/or safety regulations for purposes of the FHAA where the requested accommodation sought to ameliorate the financial burden of a regulation where the regulation imposed similar costs on all groups. *Hemisphere Bldg. Co., Inc. v. Vill. Of Richton Park*, 171 F.3d 437, 440–41 (7th Cir. 1999). As the Seventh Circuit observed, "[a]nything that makes housing more expensive hurts handicapped people; but it would be absurd to think that the FHAA overrides all local regulation of home construction." *Id.* ("We thus disapprove the district court cases in this circuit which have held that a city must, if requested by a handicapped person, waive its requirements for the installation of sprinklers because the requirements make homes more expensive for the handicapped—as for everyone.").

Here, Plaintiff requested a three-year accommodation to install a code-approved sprinkler system due to the cost of compliance.[12] Plaintiff had recently borrowed $130,000 from the Mantellate Sisters to install a fire alarm system, and the cost of a fire sprinkler system was estimated to be an additional $120,000–$170,000 (Plaintiff received an estimate for the installation, but could not afford to pay an engineer to draw up plans). [109, ¶ 43.] Plaintiff requested up to three years to raise the money to install the fire sprinkler system, and requested permission to house residents during that time so that it could earn the money in the interim. [See 99, ¶ 48 ("Without housing men in recovery, ARH could not begin to earn money and had no ability to install the sprinklers.").] Because Blue Island's safety codes impose financial

---

[12] Plaintiff argues in its opposition memorandum that "ARH's accommodation requests never have been about an inability to afford sprinklers," claiming instead that its accommodation requests were its attempt to "ask[] the City to follow through on its promises to ARH." [106, at 10.] The Court is not persuaded. Plaintiff's argument is belied by its own admission that it lacked the necessary funds to pay for the sprinkler system, and that it needed the requested accommodations to allow it to raise those funds. [See, *e.g.*, 99, ¶ 48.] Plaintiff also says that "[m]oney *would not have been an issue*"—implying that money *is* the issue—"had the City prioritized sprinklers over the fire alarm systems." [106, at 10 (emphasis added).] But if Plaintiff had done that, then this likely would be a lawsuit about fire alarms, not fire sprinklers. In addition, whatever "promises" Blue Island allegedly made would not change the fact that Blue Island's sprinkler requirement does not hurt handicapped people *by reason of their handicap*, as would be necessary to trigger liability under the FHAA's reasonable-accommodation provision.

obligations on all groups equally (*i.e.*, the financial burden of compliance does not affect Affordable Recovery Housing by reason of its handicap), the FHAA does not require Blue Island to grant accommodations to Plaintiff because it cannot afford to comply with those codes. *Hemisphere Bldg. Co.*, 171 F.3d at 440 (asking whether the rule in question, if left unmodified, hurts "handicapped people *by reason of their handicap*, rather than * * * by virtue of what they have in common with other people, such as a limited amount of money to spend on housing"); *cf. Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990) ("Whatever specific difficulties [plaintiff] claims to have encountered, they are the same ones that face all [land users], not merely churches. The harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them."). Defendants are entitled to summary judgment on this claim as well.

### F.    Other Arguments

Before closing the door on this case, the Court addresses Plaintiff's frequently-made arguments that Blue Island violated its rights by (a) telling Plaintiff to prioritize the fire alarm system over the sprinkler system, effectively amending Plaintiff's five-year plan, and (b) granting Plaintiff approval to move 40 men onto the property and then reversing course and evicting those (and other) men based on a preexisting code violation. Essentially, Plaintiff's argument is that the City's left hand didn't know what its right hand was doing, and Plaintiff suffered by relying on certain verbal assurances granting it leeway in complying with the City's safety regulations.

As an initial matter, these are disputed facts (Defendants allege that no such assurances were given) that would, at most, tee-up a credibility determination for the jury. But because these facts are not material to any of Plaintiff's legal claims, Plaintiff's reliance on them is unavailing.

As to the "prioritization" argument, even if Commissioner Mindeman did tell Plaintiff to *prioritize* the installation of the fire alarm system over the fire sprinkler system, the very concept of prioritization means that one task is less important than another, not that one task is irrelevant. In addition, Commissioner Mindeman allegedly made this statement in March 2011, and the eviction occurred in May 2012. As Fire Chief Vrshek pointed out in his eviction notice, Plaintiff had fallen behind on many of the representations in its five-year plan by that time, including all of its representations relating to fire sprinkler systems. Plaintiff says repeatedly that Commissioner Mindeman "changed the plan," but it is unreasonable to say that this "change" completely absolved Plaintiff of its duty to comply with Blue Island's fire safety regulations or its procedures for obtaining approval for regulatory non-compliance. Indeed, in that 14-month interval between this alleged conversation and the Fire Chief's eviction notice, Plaintiff did not take any steps towards installing a fire sprinkler system, towards memorializing these "changes" in writing, towards apprising the City as to its "revised" timeline for installing a sprinkler system, or towards obtaining written approval from the City allowing it to operate in violation of the City's fire safety code indefinitely.

As to the "reversing course" argument, even if Commissioner Mindeman did allow Plaintiff to move 40 men onto the Mother of Sorrows property in March 2011, when the eviction occurred 14 months later, Plaintiff had 73 program participants residing at the property. At that point, Plaintiff—which, again, had fallen behind on many of its representations regarding code compliance as presented in its five-year plan—had nearly double the number of (allegedly) approved men residing at its property without having any written instrument reflecting the City's knowledge or approval of its actions.

The Court highlights these "prioritization" and "reversing courts" arguments because Plaintiff presents them as the factual foundation for nearly all of its legal claims. But Plaintiff's arguments are hyperbolized. Plaintiff fails to acknowledge the change in circumstances in the 14-month period following Commissioner Mindeman's purported comments, and how during this period Plaintiff focused more on the growth of its organization and less on its compliance with the City's zoning and safety regulations. Another problem is that Plaintiff fails to connect its arguments to any legal principles. While it is likely improper for a municipality to make a decision in favor of one of its residents and then to punish that resident for following that decision,[13] it is incumbent upon the plaintiff to tie that wrong to an appropriate cause of action. Plaintiff's attempt to square-peg its arguments into the round holes of the many claims it asserts in this lawsuit lacks the requisite connective tissue (*i.e.*, supportive case law) to create a triable issue of fact.

---

[13] There is a reliance-based theory of liability in the RLUIPA context, where a plaintiff can establish that it suffered a substantial burden if it took action in reliance on a representation from a municipality regarding a zoning regulation, and then they municipality reneged on its representation. See *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 850–51 (7th Cir. 2007) ("[O]nce the organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship on it."). Even if the Court were inclined to import this theory into Plaintiff's claims (recall that the subject matter surrounding Commissioner Mindeman's alleged comment relates to the City's enforcement of its safety regulations, not its zoning laws, putting this beyond the scope of RLUIPA), the undisputed facts of this case do not support a reliance argument. Plaintiff cannot rely on an informal statement about the prioritization of safety-related tasks to ignore an applicable safety regulation indefinitely.

**IV.** **Conclusion**

For the foregoing reasons, Plaintiff's motion for summary judgment [99] is denied and Defendants' motion for summary judgment [100] is granted. Plaintiff's motion to file a reply brief [111] is granted. Judgment will be entered against Plaintiff and in favor of Defendants.

Dated: September 21, 2016

_____
Robert M. Dow, Jr.
United States District Judge